### CITY OF PARKERSBURG v. BALTIMORE & O. R. CO. *

(Circuit Court of Appeals, Fourth Circuit. December 14, 1923.)

No. 2101.

1. **Municipal corporations ⬤═967(2)—Unless expressly authorized, without power to exempt property.**

    Taxation being an essential function of government, authority to relinquish it must be clearly conferred, and every doubt will be resolved against the existence of the power of exemption and against the averment that such power has been exercised.

2. **Municipal corporations ⬤═967(1)—Municipality not estopped by failure to exercise taxing power.**

    An attempt by a municipal council to exempt property from taxation, or to ratify such attempted exemption, without legal authority, is absolutely void, and no omission of the council to levy and collect taxes thereon can operate to confer the right of exemption by estoppel.

3. **Municipal corporations ⬤═967(1)—Contract to accept a service in lieu of taxes not an exemption.**

    A contract by a municipal corporation to allow all or a part of taxes on property in payment for a continuous service is not an exemption of the property and may be valid.

4. **Municipal corporations ⬤═967(2)—Municipality may not commute future taxes for a present lump consideration.**

    A municipal council may not, without legislative authority, bargain away its power and duty to tax for a present lump consideration in money or land.

---

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Order allowing appeal to Supreme Court filed, 297 Fed. 1019.

5. **Municipal corporations ⬡⟹967(4)—Exemption of railroad mortgagor from taxation does not inure to benefit of purchaser at foreclosure sale.**

Conveyance of the property of a railroad company with its franchises, rights, and privileges, under a foreclosure sale, does not carry to the purchaser a right of exemption from taxation which had been enjoyed by the mortgagor.

6. **Judgment ⬡⟹572(1)—Order on sustaining judgment final, but order overruling demurrer with leave to answer is not.**

An order or decree on a demurrer and entry of final judgment or decree thereon is a final adjudication of the point involved, but an order overruling a demurrer, with leave to file an answer raising the same question made by the demurrer, is not an adjudication of the merits.

7. **Estoppel ⬡⟹62(5)—Municipality not estopped by acts of officers beyond the scope of their powers.**

When an act is within the general scope of municipal power, and is not expressly forbidden by law, the conduct of its officers may be attributed to a municipality as laches or estoppel, but an attempt by officers to exempt property from taxation, which is wholly without the scope of its powers, is void, and cannot affect the rights of the municipality.

8. **Estoppel ⬡⟹91(1)—Neglect of parties to bring cause to hearing after preliminary injunction held not ground for decree against defendant without trial on the merits.**

Neglect of a plaintiff, the actor in the cause, to prosecute his case to final hearing, may well result in its dismissal, but neglect of defendant, who sought no affirmative relief, or neglect of both parties, to bring the cause to final hearing, after the granting of a preliminary injunction, is not ground for granting affirmative relief against the defendant without a trial on the merits.

9. **Municipal corporations ⬡⟹967(4)—Owner of railroad property exempted from taxation by void contract entitled to equitable accounting.**

Where a railroad company conveyed real estate to a city in consideration of exemption of its property from municipal taxation, which the city had no lawful power to grant, on a subsequent adjudication of the invalidity of the contract the company, if still owner of the property, would be entitled to a return of the real estate, or its value, with interest, but would be chargeable with the taxes it should have paid, with interest; but where the company went out of existence after ten years, during which time it had the benefit of its exemption, the right to an accounting did not inure to the benefit of the successor to its property through foreclosure sale.

10. **Municipal corporations ⬡⟹967(4)—Ordinances held not to grant exemption of property of railroad company from taxation.**

City ordinances granting rights and privileges to a railroad company, and by which it agreed to build a municipal wharf, *held* not to show that it paid any consideration for exemption of its property from municipal taxation, which it was entitled to reclaim on the exemption being denied.

Waddill, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Northern District of West Virginia, at Parkersburg; William E. Baker, Judge.

Suit in equity by the Baltimore & Ohio Railroad Company against the City of Parkersburg. Decree for complainant, and defendant appeals. Reversed.

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Francis P. Moats and Robert B. McDougle, both of Parkersburg, W. Va., for appellant.

Mason G. Ambler and J. W. Vandervort, both of Parkersburg, W. Va., and Frank W. Nesbitt, of Wheeling, W. Va., for appellee.

Before WOODS and WADDILL, Circuit Judges, and GRONER, District Judge.

WOODS, Circuit Judge. The vital question to be decided is whether the city of Parkersburg has lost the right to collect taxes on property of the Baltimore & Ohio Railroad Company situated in the city. The right to be perpetually free from city taxation is asserted by the railroad company on these grounds: (1) Exemption or commutation by a city ordinance of June 8, 1855, a contract with the city of the same date and subsequent ratification thereof; (2) adjudication of July 13, 1897, that the attempted exemption or commutation was valid; (3) laches of the city in acquiescing in the assertion of the validity of the exemption or commutation from 1855 to 1893, and from 1897 to 1921. The material facts will appear from a summary of the bills and the course and status of the litigation.

On April 10, 1894, the Baltimore & Ohio Railroad Company filed a bill in the Circuit Court for the District of West Virginia and on August 6, 1895, an amended and supplemental bill to enjoin the city of Parkersburg from the threatened forcible collection of $1,042.73 taxes claimed for the year 1893. The bill set out an ordinance of the president, recorder, and trustees of the town of Parkersburg and a contract made in pursuance thereof between the town and the Northwestern Virginia Railroad Company, both dated June 8, 1855. Under the ordinance and contract the railroad company was to receive from the town the right to the free and exclusive use and occupation for railroad purposes of the lands, banks, shores, and water rights within described boundaries, and "the right to lay and use railroad tracks with suitable switches and turnouts along and across such of the streets and alleys of the said town as they may deem necessary to connect their stations and other improvements." These rights were subject to the obligation of the railroad company to keep the streets open for traffic, to grade and keep in repair the portion of the streets between sidewalks and tracks, and to construct and maintain a certain culvert. All the property of the railroad company then owned, or thereafter acquired, used for railroad purposes, was to be "free from all town taxes, assessments and charges." The consideration to the town was the grant of all the right, title, and interest of the railroad company in lands conveyed to it by Jackson and others, to be used by the town exclusively for wharfage purposes, the construction of two wharfs on the Ohio river, one of them at the foot of Court street, subject to the condition that rates for wharfage should not exceed the lowest rate at certain cities named, except by consent of the railroad company, and that the railroad company should have free wharfage. By the records of the town council of July 13, 1855, it appears that the ordinance and contract were for the adjustment of conflicting claims of title to the banks of the Ohio and Kanawha rivers.

On February 15, 1865, at a foreclosure sale, the Baltimore & Ohio Railroad Company became the purchaser of the property of the Northwestern Virginia Railroad Company, and thereafter conducted its business under the name of Parkersburg Branch Railroad Company. After the foreclosure sale, on May 30, 1865, and May 10, 1867, ordinances were passed declaring the ordinance of June 8, 1855, to be in full force and virtue, but making no special reference to the attempted tax exemption. The ordinance of May 10, 1867, extended the railroad's use of the streets in the city upon condition that the railroad company, in accordance with the agreement of June 8, 1855, with the Northwestern Virginia Railroad Company, should construct the wharf on Court street to be the property of the city. On March 15, 1870, in consideration of the payment of $7,500, the railroad company was released from its obligation to build the wharf on Court street.

On these facts, set out in the bill and exhibits, the court on April 10, 1894, issued a temporary injunction ex parte. The city on May 7, 1894 filed a demurrer to the original bill on the ground that it appeared from the face of the bill that complainants were not entitled to the injunction asked. Afterwards, on June 14, 1894, the city filed its answer alleging lack of power in the city council to exempt the railroad company from taxes or to commute taxes in the manner set up in the bill, and setting up other defenses. On June 20, 1894, plaintiff filed exceptions to the answer of the city as impertinent and immaterial. Plaintiff filed an amended and supplemental bill on August 16, 1895, and obtained another temporary injunction. On September 3, 1895, the city demurred to the amended and supplemental bill, setting out its grounds of objection with more detail.

Under the bills and demurrers the validity of the attempted tax exemption was elaborately argued before Hon. Nathan Goff, Circuit Judge. The demurrers were overruled on July 13, 1897, in a formal decree containing this provision:

"And thereupon came the defendants and asked leave to file their separate answers, heretofore tendered in this cause, to the original bill and the same being considered by the court and ordered filed, and leave is given them to file answer to said amended and supplemental bill within 30 days from this date."

Thereafter, on August 11, 1897, the city filed its answer to the amended and supplemental bill reiterating the defenses set up in the answer to the original bill, again alleging the invalidity of the ordinances and contracts of the city council in so far as they purported to exempt the Northwestern Railroad Company and the Baltimore & Ohio Railroad Company from taxes, and alleging that, even if the attempted exemption of June 8, 1855, of the Northwestern Virginia Railroad Company was valid, the Baltimore & Ohio Railroad Company did not acquire such exemption by purchase at the foreclosure sale.

On June 9, 1920, an order was made in the District Court striking the cause from the docket. On January 17, 1921, on motion, an order was made restoring the cause to the docket, the order reciting that it appeared to the court—

"from the last order entered in said cause that the same was heretofore submitted to the court upon the motion of the plaintiff to perpetuate a temporary

injunction theretofore granted, and upon the motion of the defendant, the city of Parkersburg, to dissolve said temporary injunction, and that neither of said motions, so far as the record discloses, have been disposed of by the court."

On June 3, 1922, counsel for the city moved that the cause be set for hearing. Plaintiff's counsel objected and moved to strike out the answers—

"upon the ground that the said the city of Parkersburg has acquiesced in the injunctions awarded herein on the 10th day of April, 1894, and the 16th day of August, 1895, and through the lapse of more than a quarter of a century has failed to take any action looking to the dissolution of the said injunctions, and has long since abandoned its claim for the taxes, the collection of which was restrained by said injunctions, and has failed to do or offer to do equity herein, and for other reasons appearing in the record."

On January 10, 1923, counsel for the city moved to dissolve the preliminary injunctions and dismiss the suit. By final decree, dated February 7, 1923, the answers of the city of Parkersburg were stricken from the record and the preliminary injunctions were made permanent. The appeal is from this decree.

[1] The town of Parkersburg was chartered in 1820. Neither the original charter nor any amendment confers, either directly or by implication, power to exempt property from taxation. Taxation being an essential function of government, the authority to relinquish it must be clearly conferred, and every doubt will be solved against the existence of the power of exemption and against the averment that such a power has been exercised. Wilmington & Weldon Railroad v. Alsbrook, 146 U. S. 279, 294, 13 Sup. Ct. 72, 36 L. Ed. 972; St. Louis v. United Railways Co., 210 U. S. 266, 273, 28 Sup. Ct. 630, 52 L. Ed. 1054; J. W. Perry Co. v. Norfolk, 220 U. S. 472, 480, 31 Sup. Ct. 465, 55 L. Ed. 548; Whiting v. West Point, 88 Va. 905, 14 S. E. 698, 15 L. R. A. 860, 29 Am. St. Rep. 750; Richmond v. Virginia Railway & Power Co., 124 Va. 529, 98 S. E. 691; 3 Dillon's Municipal Corporations (5th Ed.) § 1310.

[2] All attempts of the municipal council to exempt from taxation or to ratify such attempted exemption, being without legal foundation, were absolutely void; and no omission of the council to levy and collect taxes could operate to confer the right of exemption by estoppel. Marsh v. Fulton County, 10 Wall. 676, 19 L. Ed. 1040; Loan Association v. Topeka, 20 Wall. 655, 22 L. Ed. 455; Parkersburg v. Brown, 106 U. S. 487, 501, 1 Sup. Ct. 442, 27 L. Ed. 238; Daviess County v. Dickinson, 117 U. S. 657, 6 Sup. Ct. 897, 29 L. Ed. 1026; Bloomfield v. Charter Oak Bank, 121 U. S. 121, 136, 7 Sup. Ct. 865, 30 L. Ed. 923; Barnett v. Denison, 145 U. S. 135, 139, 12 Sup. Ct. 819, 36 L. Ed. 652; Brenham v. German-American Bank, 144 U. S. 173, 183, 12 Sup. Ct. 559, 36 L. Ed. 390. "The protection of public corporations from such unauthorized acts of their officers and agents is a matter of public policy in which the whole community is concerned. And those who aid in such transactions must do so at their peril." Thomas v. City of Richmond, 12 Wall. 349, 20 L. Ed. 453.

[3] It is true that it has been held in numerous cases that a city may make a valid contract to pay or allow the whole or a part of the

taxes as compensation for a continuous service rendered, such as furnishing water to the city. This is put on the ground that in such case there is no exemption from taxes, but an agreement in substance that the amount of the taxes should be paid from year to year as compensation for the current service rendered. Conery v. New Orleans Waterworks Co., 41 La. Ann. 910, 7 South. 8; Board of Councilmen v. Capital Gas & Electric Light Co. (Ky.) 29 S. W. 855; Town of Cannan v. Enfield Village Fire District, 74 N. H. 517, 70 Atl. 250, 258; Maine Water Co. v. City of Waterville, 93 Me. 586, 45 Atl. 830, 49 L. R. A. 294; Phillips v. City of Portsmouth, 115 Va. 180, 78 S. E. 651; Bartholomew v. City of Austin, 85 Fed. 359, 29 C. C. A. 568; Grant v. Davenport, 36 Iowa, 405; Montclair Water Co. v. Town of Montclair, 81 N. J. Law, 573, 79 Atl. 258; Alpena City Water Co. v. City of Alpena, 130 Mich. 413, 90 N. W. 36; Id., 213 Mich. 518, 90 N. W. 323.

Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162, is relied on as sustaining the validity of the ordinance and contract of exemption. Minnesota received a grant of land from the United States "for the purpose of aiding in the construction of a railroad * * * from * * * St. Paul to the head of Lake Superior." The state granted the land to the Lake Superior & Mississippi Railroad for railroad purposes and no other. In consideration of the grant the railroad agreed to pay, on or before the 1st day of March of each year, 3 per cent. of the gross earnings "in lieu and in full of all taxation and assessments." The lands were, however, to be subject to the usual land tax as soon as sold or leased. Other lands involved in the litigation were granted to the Northern Pacific Railroad Company by the United States, the railroad being required by its congressional charter to obtain the consent of any state through which it might pass before commencing work. The state of Minnesota gave its consent to the construction of the road on the condition that the lands and other property of the railroad company should pay the same per cent. of its gross earnings to the state as had been exacted of the Lake Superior & Mississippi Railroad, in full and in lieu of all taxes. Afterwards the Legislature of Minnesota undertook by statute to subject the property of both railroads to the taxes levied on all other property in the state, *in addition* to the percentage of gross earnings stipulated in the grants to be in full of all taxes.

It is to be observed that the question was not one of complete exemption from taxation, but of the right of a state to grant land and affix as a condition of the grant the measure of taxes which the grantee was to pay each year. The majority of the court held that the method of taxation provided by the grant was not an exemption; that it was by virtue of the contracts fixing the tax that land not before subject to taxation as property of the state and of the United States was made taxable; that in bringing it in as taxable property the state could attach any condition precedent it saw fit; and that therefore the state could not impose the current rate of taxation for other property in addition to the 3 per cent. of gross earnings contracted to be in full of all taxes. None of this reasoning nor the conclusion of the court can apply to the

facts in the case before us. Four judges dissented from the majority view, insisting that the contract was an attempt to exempt property from taxation and impose an unequal tax in violation of the state Constitution, and further that the statute of the state exacting the 3 per cent. of gross earnings in addition to the tax imposed on other property was in violation of the constitutional requirement of uniform taxation.

[4] No authority has been cited, and we think none can be found, holding that a municipal council, without legislative authority, may for a lump consideration in land or money bargain away the power and duty to tax. Statement of the claim of such power is its own refutation. If a municipality could bargain with one taxpayer to accept a gross sum in commutation of all future taxes, it could so bargain with all. The exercise of such a power would destroy the continuous flow of financial resources essential to the life of the municipality and implicit in the word "taxation."

[5] But even if the ordinance and contract of June 8, 1855, had been a valid exemption from taxation of the Northwestern Virginia Railroad Company, the exemption would not extend to the Baltimore & Ohio Railroad Company, alleged to be the real purchaser at the foreclosure sale made to the Parkersburg Branch Railroad Company in February, 1865. Immunities and exemptions were not mentioned in the mortgage, nor in the deed of conveyance under foreclosure. Conveyance of the property of a railroad with the franchises, rights, and privileges does not carry to the purchaser at a foreclosure sale the right of exemption from taxation which had been enjoyed by the mortgagor. Rochester Railway Co. v. Rochester, 205 U. S. 236, 27 Sup. Ct. 469, 51 L. Ed. 784; Yazoo & Mississippi R. R. Co. v. Vicksburg, 209 U. S. 358, 28 Sup. Ct. 510, 52 L. Ed. 833; Wright v. Georgia R. R. & Banking Co., 216 U. S. 437, 30 Sup. Ct. 242, 54 L. Ed. 544; Morris Canal Co. v. Baird, 239 U. S. 126, 131, 36 Sup. Ct. 28, 60 L. Ed. 177.

Therefore the Baltimore & Ohio Railroad Company, as purchaser under the name of Parkersburg Branch Railroad Company, took the property in February, 1865, stripped of the tax exemption in favor of the Northwestern Virginia Railroad Company, if it had ever existed. The Baltimore & Ohio Railroad Company avers that, even if this be true, it was exempted from taxation by the ordinances of May 30, 1865, and May 10, 1867, passed after the foreclosure sale.

Assuming, without deciding, the requirement of the Constitution of West Virginia of 1863 that all taxation shall be equal and uniform to apply only to taxation by the state and not to that by municipal corporations, we think the city ordinances of May 30, 1865, and May 10, 1867, are unavailing to protect the Baltimore & Ohio Railroad Company from taxation. These ordinances in general terms declare the ordinance of June 8, 1855, and all other ordinances accepted by the Northwestern Virginia Railroad Company and not repealed, to be binding on the city and on the Parkersburg Branch Railroad Company, "as the successors to the former parties thereto." No mention is made of exemption from taxation attempted by the ordinance of June 8, 1855. These ordinances fail to relieve the Baltimore & Ohio Railroad Company of its taxes for total want of power in the council to exempt from

taxation. It follows that all the attempts of the municipal council by ordinances and contract to exempt the railroad company from taxation were absolutely void.

[6] The city has not lost its right to collect the tax by adverse adjudication in this litigation. An order or decree on a demurrer and the entry of final judgment thereon is an adjudication of a point involved. Bissell v. Spring Valley Township, 124 U. S. 225, 8 Sup. Ct. 495, 31 L. Ed. 411; Wiggins Ferry Co. v. Ohio & Mississippi Railway, 142 U. S. 396, 12 Sup. Ct. 188, 35 L. Ed. 1055. But an order overruling a demurrer is not an adjudication of the merits, when there is no final decree or judgment, and leave is granted to file an answer raising the same question made by the demurrer. Here, in overruling the demurrer to the bill, the defendant was given leave to file an answer putting in issue questions made by the demurrer. This was refusing to decide the issue on demurrer, leaving it for decision on the final hearing.

"A demurrer to a complaint because it does not state facts sufficient to constitute a cause of action, is equivalent to a general demurrer to a declaration at common law, and raises an issue which, when tried, will finally dispose of the case as stated in the complaint, on its merits, *unless leave to amend or plead over is granted.* The trial of such an issue is the trial of the cause as a cause, and not the settlement of a mere matter of form in proceeding. There can be no other trial except at the discretion of the court, and if final judgment is entered on the demurrer, it will be a final determination of the rights of the parties, which can be pleaded in bar to any other suit for the same cause of action. Under such circumstances, the trial of an issue raised by a demurrer which involves the merits of the action is, in our opinion, a trial of the action within the meaning of the Act of March 3, 1875." Alley v. Nott, 111 U. S. 472, 475, 4 Sup. Ct. 495, 496 (28 L. Ed. 491); Virginia v. West Virginia, 206 U. S. 290, 27 Sup. Ct. 732, 51 L. Ed. 1068; Kansas v. Colorado, 185 U. S. 125, 22 Sup. Ct. 552, 46 L. Ed. 838; Anderson v. Olsen, 188 Ill. 502, 59 N. E. 239; Foster-Eddy v. Baker (C. C.) 192 Fed. 624. The limitation of the general doctrine expressed in the words we have italicized applies. The rights of the parties were, therefore, unadjudicated, and the cause was pending for trial when the final decree for a permanent injunction was entered February 7, 1923.

The argument is made that the city has lost its right to collect the tax for the year 1893, the tax enjoined, and taxes for all subsequent years as well, by laches, in that the municipal authorities failed to attempt to collect the taxes from 1855 to 1893, and after the temporary injunction in 1897 failed to bring the cause on for a final hearing until 1921.

[7] When an act is within the general scope of municipal power, and is not expressly forbidden by law, the conduct of its officers may be attributed to a municipality as laches or estoppel according to circumstances. Illustrative cases are Bank v. Dandridge, 12 Wheat. 64, 63 L. Ed. 552, and Boone v. Burlington, 139 U. S. 684, 11 Sup. Ct. 687, 35 L. Ed. 319. But the attempt to exempt from taxes being entirely without the scope of its power, the council in attempting to con-

fer exemption did not represent the municipality. The effort to bind the city by the attempt was of no more effect than would have been an effort by the council to legislate or make contracts for another municipality or the entire state. In such case no laches or attempt at ratification by the council could bind the city. "A contract of a corporation, which is ultra vires, in the proper sense, that is to say, outside the object of its creation as defined in the law of its organization, and therefore beyond the powers conferred upon it by the Legislature, is not voidable only, but wholly void, and of no legal effect. The objection to the contract is, not merely that the corporation ought not to have made it but that it could not make it. The contract cannot be ratified by either party, because it could not have been authorized by either. No performance on either side can give the unlawful contract any validity, or be the foundation of any right of action upon it." Central Transp. Co. v. Pullman's Palace Car Co., 139 U. S. 24, 59, 11 Sup. Ct. 478, 488 (35 L. Ed. 55); Jacksonville, etc., Railway v. Hooper, 160 U. S. 514, 524, 530, 16 Sup. Ct. 379, 40 L. Ed. 515; California Bank v. Kennedy, 167 U. S. 362, 368, 17 Sup. Ct. 831, 42 L. Ed. 198; Marsh v. Fulton County, 10 Wall. 676, 19 L. Ed. 1040; Parkersburg v. Brown, 106 U S. 487, 501, 1 Sup. Ct. 442, 27 L. Ed. 238; Daviess County v. Dickinson, 117 U. S. 657, 6 Sup. Ct. 897, 29 L. Ed. 1026; Flowers v. Logan County, 137 Am. St. Rep. 357, 368, 375, note; Neacy v. Drew, 176 Wis. 348, 187 N. W. 218; Mayor of Hogansville v. Planters' Bank, 27 Ga. App. 384, 108 S. E. 480; Milster v. Spartanburg, 68 S. C. 33, 46 S. E. 539; 2 Dillon on Municipal Corporations (5th Ed.) § 951; Bigelow on Estoppel (5th Ed.) 466.

As to attempts to found a right of action on a void contract and acts done under it, the court said in Thomas v. Railroad Co., 101 U. S. 71, 86 (25 L. Ed. 950):

"To hold that they can is, in our opinion, to hold that any act performed in executing a void contract makes all its parts valid, and that, the more that is done under a contract forbidden by law, the stronger is the claim to its enforcement by the courts."

Contrary to these express decisions of the Supreme Court, the suit of the Baltimore & Ohio Railroad Company is a plain attempt to obtain the affirmative relief of injunction by virtue of void ordinances and a void contract, and omissions and actions alleged to constitute laches and ratifications. Such a suit is without foundation.

[8] Nor can we agree, as held by the District Court, that the plaintiff, Baltimore & Ohio Railroad Company, is entitled to have a final decree for a permanent injunction in its favor on the ground that the city, the defendant, failed to press the cause for a hearing. The railroad company was the actor. The temporary injunction adjudged nothing, and had no effect, except to stay the collection of the tax until the final decree. The decree of the District Court makes the deliberate failure of the complainant to press for a final decree equivalent to a final decree in its favor. Neglect of a plaintiff, the actor in the cause, to prosecute his case to final judgment, may well result in its dismissal; but the neglect of the defendant, who sought no affirmative relief, or the neglect of both parties to bring the cause to a final hearing, is not

a ground for granting affirmative relief against the defendant, without a trial on the merits. Surely the defendant was guilty of no delay of which the plaintiff was not equally guilty. If the parties are equally guilty of delay, neither can avail itself of the delay of the other as laches. Nordman v. Meyer, 118 Iowa, 508, 92 N. W. 693, 694; Mays v. Morrell, 65 Or. 558, 132 Pac. 714; 21 C. J. 215; Kansas City Southern R. Co. v. Boles, 88 Ark. 533, 115 S. W. 375, 378; Georgia R. & Banking Co. v. Wright, 124 Ga. 596, 53 S. E. 251, 266. Relieving the plaintiff of the responsibilities and penalties of neglect to prosecute, and imposing them on the defendant, is reversing the rule of law.

[9] The last position taken by the complainant is that the city of Parkersburg must abide by the void ordinances and contract until it offers to restore the consideration received from the railroad companies for the exemption. If the Northwestern Virginia Railroad Company had continued business, and continued to own the railroad property in Parkersburg, and were the plaintiff here, it could set up in this equity suit that it was entitled to a return of the property known as the Jackson lots and the value of its use, if that could be made without detriment to the city, or to payment of the value of the property to the city and interest. In the adjustment the Northwestern Virginia Railroad Company would be required to account for the value of all the benefits received by it in the transaction with interest, and for the taxes it should have paid for all the intervening years, with interest. This we understand would be the result of the principle sanctioned in Louisiana v. Wood, 102 U. S. 294, 26 L. Ed. 153; Parkersburg v. Brown, 106 U. S. 487, 503, 1 Sup. Ct. 442, 27 L. Ed. 238; Chapman v. Douglas County, 107 U. S. 348, 360, 2 Sup. Ct. 62, 27 L. Ed. 378; Salt Lake City v. Hollister, 118 U. S. 256, 263, 6 Sup. Ct. 1055, 30 L. Ed. 176; Pennsylvania Railroad v. St. Louis, etc., Railroad, 118 U. S. 317, 318, 6 Sup. Ct. 1094, 30 L. Ed. 86; Railway Companies v. Keokuk Bridge Co., 131 U. S. 371, 389, 9 Sup. Ct. 770, 33 L. Ed. 157; Luther v. Wheeler, 73 S. C. 83, 52 S. E. 874, 4 L. R. A. (N. S.) 746, 6 Ann. Cas. 754.

But the property conveyed and the benefits conferred by the Northwestern Virginia Railroad Company on the city was for the consideration of exemption of the Northwestern Virginia Railroad Company from its taxes. This promise of exemption, though void, was actually performed, and the Northwestern Virginia Railroad Company was in fact exempted from taxation for the whole period of its existence after June 8, 1855, the date of the ordinance and contract, until its property was sold in February, 1865. The city is now barred by the statute from recovery of these taxes. The Northwestern Virginia Railroad Company has therefore received all that the city council attempted to promise for the city in consideration of the conveyance to the city of the Jackson lots, and it has no claim against the city either legal or equitable for failure of consideration.

It is equally evident that the Baltimore & Ohio Railroad Company has no valid claim. As we have seen, the ordinance and contract of June 8, 1855, even if they had been valid, would have conferred no right of exemption on the Baltimore & Ohio Railroad Company, purchaser at the foreclosure sale. It follows that the Baltimore & Ohio

Railroad Company, the plaintiff here, has no equity to require return of the Jackson lots conveyed by the Northwestern Virginia Railroad Company to the city as consideration for exemption of the property of the Northwestern Virginia Railroad Company or an accounting of their value to the city.

[10] The ordinance of May 30, 1865, contains no statement of any consideration whatsoever going from the Baltimore & Ohio Railroad Company to the city, and hence it may be left out of consideration. The ordinance of May 10, 1867, bears the title:

"An ordinance to widen Washington street, and to authorize the Parkersburg Branch Railroad Company to extend their track through the city to the Ohio river."

Sections 1, 2, and 3 all relate to privileges and powers granted to the Baltimore & Ohio Railroad Company, and they are very valuable privileges and powers. None of them impose any duty from the railroad company to the city. By section 4 the railroad company is required to put in a wharf at the foot of Court street as one of the conditions of the powers and privileges granted in the preceding sections of the ordinance. It is a distinct and separate requirement of the railroad. Sections 5, 6, 7, and 8 relate entirely to the widening of Washington street to 60 feet. Section 5 provides that it shall be widened to 60 feet. Sections 6 and 7 provide for the acquisition by condemnation of the land required for the purpose by the city. Section 8 provides that the land required shall be conveyed to the city; but it provides further that, if the railroad company should determine to construct an extension on any of the land so condemned, then the land shall be conveyed to the railroad company, with the provision that it shall leave a passway of 7 feet and spaces between the piers on Washington street free and unobstructed. Section 9 provides that the city shall issue its bonds for $15,000 to pay for the land so required and that the railroad company shall pay the remainder not met by the sale of the city bonds.

From this statement it is evident that the railroad company received very valuable rights and privileges from the city. For these it assumed only two obligations, that imposed by section 4 to build a wharf at the foot of Court street, and the other to pay for the land condemned any balance after the application of the proceeds of the city's bonds for $15,000. There is no allegation in either bill that the railroad company paid anything at all for the acquisition of the property. The only thing, therefore, that could possibly be regarded as a consideration by the railroad company for the many rights and privileges granted in the ordinance of May 10, 1867, was the undertaking to construct a wharf at the foot of Court street. The ordinance amending the ordinance of May 10, 1867 provides for the payment of $7,500 as the consideration of the release of the railroad company from the obligation to build the wharf at the foot of Court street.

With this analysis, reading in connection the ordinances of May 30, 1865, May 10, 1867, and the ordinance of March 15, 1870, amending the ordinance of May 10, 1867, it is evident that the obligation to build the wharf at the foot of Court street, and the payment of $7,500 for release from that obligation was not a consideration for exemption

from taxation which is not mentioned, but for the numerous privileges and rights specifically conferred on the railroad company by these ordinances. This is made all the more evident by the fact that section 3 of the ordinance of May 30, 1865, and the same section of the ordinance of May 10, 1867, declaring in force the ordinance of June 8, 1855, and the deed executed at the same time, relate exclusively to permission to the railroad company to use steam on their trains, and make no mention of tax exemption.

We cannot construe these ordinances as expressing beyond doubt an intention to exempt the Baltimore & Ohio Railroad Company from taxation, and expressing that the $7,500 paid in discharge of the obligation to build the wharf at the foot of Court street was a consideration for an attempted exemption from taxation. Such a construction would violate the rule so well established that the power to exempt and the intention to exempt must be clear beyond doubt.

Take, however, the contrary view, and assume in favor of the plaintiff that the $7,500 paid by the plaintiff March 15, 1870, was paid entirely as a consideration for the exemption from taxes. Give the plaintiff credit for the entire sum of $7,500 and interest from March 15, 1870, as a valid equitable claim against the city in favor of the plaintiff. The city would have the clear equity to set off against this debt of $7,500 the taxes and interest thereon owing by the plaintiff from February 15, 1865, the date when plaintiff acquired the railroad property, to January 1, 1894. The aggregate of these taxes for these 29 years owing to the city and interest thereon would far exceed the $7,500 and interest considered as a payment for exemption from taxation. Thus it plainly appears that the plaintiff has received in illegal exemption from taxes which it is now too late for the city to recover, much more than the consideration paid for the exemption, and that it has no legal or equitable claim against the city.

The plaintiff's claim for exemption being without foundation, and the record disclosing no ground for equitable relief, the District Court should have dismissed the bill.

The decree of the District Court is reversed.


WADDILL, Circuit Judge (dissenting). The defendant in error, Baltimore & Ohio Railroad Company, hereinafter called the railroad, on the 10th of April, 1894, filed its bill in equity in the United States Circuit Court for the District of West Virginia, against the plaintiff in error, the city of Parkersburg, hereinafter called the city, the purpose of which was to enjoin the collection of a city tax for the year 1893 of $1,042.73, claimed to be due by the railroad to the city, and by an amended bill filed on the 6th of August, 1895, the railroad company sought to enjoin the collection of another sum of $1,042.73, city tax for the year 1894. Injunctions were awarded on the 10th of April 1894, on the first bill, and on the 16th of August, 1895, on the amended bill. Whereupon the city appeared and filed its demurrer to the original bill, and afterwards, on the 14th day of June, 1894, filed its answer, to which answer the railroad on the 20th of June, 1894, filed exceptions, and on the 13th of September, 1895, the city filed its de-

murrer to the amended bill, setting out its defense in greater detail. Upon these pleadings, and a motion to dissolve the injunction, the cause was elaborately argued on the 2d of October, 1895, and submitted to the judge for consideration with leave to file written or printed briefs by the 1st day of the following December. On the 13th of July, 1897, the demurrers were overruled, the injunctions allowed to stand, and the city given leave to answer the amended bill, which was filed on the 11th of August following.

The cause remained in this condition until it appears that by an order entered on the 11th of January, 1911, some 14 years later, the city attorney was permitted to withdraw the papers from the files, with a view of inspecting them, and on the 17th of January, 1921, 10 years later, an ex parte order was entered, reinstating the cause upon the docket; the same having been, as appears from the recitals of the last-named decree, removed from the docket on the 9th of January previous. On the 3d of June, 1922, the cause was submitted to the judge of the court upon the railroad's exceptions to the answer, and its objections to the further hearing of the cause, because of the city's long acquiescence in the injunction granted as aforesaid, and upon the city's further motion, made on the 10th of January, 1923, to dissolve the preliminary injunctions theretofore awarded and dismiss the bill. The court, by a final order entered on February 7, 1923, upon full consideration of the pleadings and papers in the cause, and the several motions presented by the parties, sustained the exceptions filed by the plaintiff to the defendant's answer, refused to dismiss the plaintiff's bill, and perpetuated the injunctions theretofore granted, from which order this appeal was taken.

The litigation grows out of a certain contract and deed entered into between the Northwestern Virginia Railway Company, predecessor of the plaintiff, Baltimore & Ohio Railroad, and the town of Parkersburg, predecessor of the defendant, the city of Parkersburg, whereby exchanges of properties were contracted for and entered into between the city and railway company, pursuant to an ordinance of the town theretofore duly passed, and which was subsequently confirmed and ratified by ordinances of the city of Parkersburg, passed in favor of the successor company, namely, the Parkersburg Branch of the Baltimore & Ohio Railway Company, and of the latter company.

The effect of this contract, deed, and ordinances, and what is the true interpretation and meaning of the same, and whether the contract thus entered into may be avoided by reason of the provisions relieving the railway company from payment of city taxes upon certain property enumerated within its corporate limits during the use and occupation thereof by the railroad, are the subjects to be determined here, the city's contention briefly being that the same constituted a naked exemption from taxation, and was, with everything done in connection therewith, wholly void; whereas, the railroad claims that the city was fully authorized to pass the ordinances and make and carry out the contract in question, and that the same in no sense constituted a naked exemption from taxation, as contended for, but was a commutation of such taxes by the city in consideration of the price of property con-

veyed to it, and moneys paid which constituted a valuable consideration therefor, and that the transaction was in all respects fair and favorable to the city. That these contractual undertakings thus entered into between the city and the railroad constituted a valid and binding contract and agreement between them, and was a valuable property right which inured directly to the benefit of the railroad, which, as well as its predecessor in title, paid a valuable consideration therefor, and cannot be taken away or avoided or annulled by the defendant city, is manifest, it having observed and carried out the same for some 39 years prior to the filing of the original bill herein, and subsequently acquiesced for more than a quarter of a century in the decree and order of the court overruling its defense made to the plaintiff's bill, and submitted to the injunction enjoining the effort to collect such taxes.

Five questions are apparently presented for consideration, though the assignments of error are in general terms, and do not specifically point out the errors complained of, viz.: The validity of the exemption; whether the same passed to the plaintiff railroad at the judicial sale at which it acquired its title; how far laches applies to the transaction; the effect of the injunction granted in connection with the two years' taxes specifically involved, and the overruling of the demurrer; and the right of the railroad to seek restitution for its losses in the event of the transaction being declared invalid. These several contentions will now be considered.

First. The character of the exemption, and the right to make the same.

In my view of this case, it will not be necessary to pass upon or give great consideration to the question so earnestly pressed, and for which much citation of authority is given, viz. the right of the city to make a naked exemption of the payment of taxes to the railroad. Admittedly, there is much force in what is said on this subject, when applicable, and, of course, the right to make exemption from taxation is one that should be sparsely exercised, though in no event could it be availed of as a defense here, where those making the claim have taken a contrary view and slept upon their rights for well-nigh three-quarters of a century. This is not a case of naked exemption, to which the decisions relied on are properly applicable. At the date of entering into the contract in question, there was nothing in the organic law, the statute law, judicial decisions, or public policy of the state of Virginia that forbade the exemption of property from taxation. On the contrary, it was the well-recognized policy of the state so to do. Danville v. Shelton, 76 Va. 325, 334; City of Petersburg v. Petersburg, 78 Va. 431, 435. It may be said that if the city of Parkersburg, clothed with power and authority to levy, assess, and collect city taxes, was not thereby permitted to make exemption from taxes, it is but a technical objection. The city was clothed with the fullest power to make contracts and acquire property for the city, being expressly given the power to pass laws, by-laws, and ordinances as it might deem necessary for the internal safety and convenience of the town; and there will be found no limitation, either express or implied, in the charter of the town that would forbid it from entering into an undertaking and making contracts in the town's or city's behalf, and

to that end exercise its best judgment in making such contracts for the good of the city.

Considering the case as one involving a commutation of taxes, as distinguished from naked exemption from payment thereof, the question for determination is, what is meant by commutation of taxes, and what is the law on that subject? That it is but the remuneration for payment of taxes, as distinguished from an exemption therefrom, would seem to be too plain, if there was no authority on the subject. What this transaction is does not admit of any doubt. The town was possessed of large interests, and so was the railroad, and for good reasons known to each, and looking, as is manifest, from the city's viewpoint, to aiding as far as possibly could be done in what would, they believed, be a great benefit to the town by bringing a railroad and securing its terminal there, and the railroad also owning valuable water front property recently theretofore acquired by it at a high figure, which the city desired, they agreed upon and entered into the contract in question, manifestly believing it to be for their mutual benefit; the city incidentally agreeing to exempt from town taxes the property it conveyed to the railroad, so long as the same was used for railroad purposes. The railroad was to build and maintain its tracks, depot, etc., and to construct and maintain certain large and valuable wharves for the city, enumerated in the contract. The bona fides of the transaction seemed not to have been questioned by any one, as is manifest from the fact that it was accepted by all, and allowed so to remain for more than a generation, and the desirability of what was done, taking into account the then status of the contracting parties, seems clear at even this late day.

Exemptions from and commutations of taxes are in no sense correlative terms. On the contrary, the words have a directly opposite meaning. The term "exemption" cannot be applied with propriety to a release from taxes given for a valuable consideration. 37 Cyc. 381. In Louisiana Cotton Co. v. New Orleans, 31 La. Ann. 447, the court stated that, as used with reference to taxation and assessment, the term "commute" means payment of a designated sum for the privilege of exemption, or the agreement of advancing a specific sum in lieu of an ad valorem tax.

"Commutative contracts are those in which what is done, given or promised by one party, is considered as equivalent to, or a consideration for what is done, given or promised by the other." Civil Code La. 1900, art. 1768.

"Commutation is * * * the act of substituting one thing for another, * * * a substitution of one sort of payment for another, or a single payment in lieu of a number of successive payments, usually at a reduced rate." Woodrough v. Douglas County, 71 Neb. 354, 98 N. W. 1092.

The Supreme Court of the United States, in Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162, recognized the difference between commuted taxation, and a naked exemption from the payment of taxes, and at page 237 (21 Sup. Ct. 78) the court, after noting that commutation is not the same as exemption, or forbidden by constitutional provision which forbids exemption, quotes from the case of County of Hennepin v. Railroad, 33 Minn. 535, 24 N. W. 315, as follows:

"This is not an immunity from taxation, but a commutation of taxes—another and substituted way prescribed by'law, in which the respondent, as the owner of this land * * * is to contribute its share to the public revenue."

And, also, County of Ramsey v. Railway Co., 33 Minn. 542, 24 N. W. 196:

"It was not in reality a plan for exempting property from taxation, but a substituted method of taxation. It must be supposed * * * that this system would * * * fairly effect the objects of taxation * * * and be equivalent in its results to taxation of the property owned."

Cooley on Taxation, at page 110 says:

"Where a certain sum is specified for a certain percentage upon valuation or upon receipts or acquisitions in any form, this is in the nature of a commutation of taxes, the state agreeing that the sum named is, under the circumstances, a fair equivalent for what the customary taxes would be, or the fair proportion which the person bargained with ought to pay, and the power thus to commute is undoubted. And this rule applies when a bonus is paid for complete future exemption, to the same extent and on the same reasons as when the commutation is for an annual payment."

And in the case of Stearns v. Minnesota, supra, 179 U. S. 240, 21 Sup. Ct. 79, 45 L. Ed. 162, the court further said:

"So it may well be said in the case before us that a contractual exemption of the property of the railroad company in whole, upon consideration of a certain payment, cannot be changed by the state, so as to continue the obligation in full, and at the same time deny to the company, either in whole or in part, the exemption conferred by the contract."

And in the same case (179 U. S. at page 254, 21 Sup. Ct. 85, 45 L. Ed. 162) Justice Brown concurs in the opinion on the ground that this arrangement had been acquiesced in for 30 years, and was then too late to set up its repugnance to the state Constitution as against railways which were built upon the faith of its validity.

It can hardly be debatable that a city clothed with general corporate powers necessary to its maintenance and existence, generally given in its charter, and necessarily and fairly implied therefrom, and essential to the declared objects of its franchise, could not enter into a contract to acquire property in its behalf, and to make all fair and reasonable contracts necessary to that end. This included the acquisition of property by lawful exchange, on making proper remuneration therefor, and if, in addition to doing it, it took into account its right to levy and collect taxes, what it did, if fairly and honestly done, should and ought not to be construed as an exemption from taxes, but an acceptance of property in exchange as remuneration therefor.

In considering the validity of the contract, deed, and ordinances of the city, every presumption favorable to their validity should be indulged. Memphis v. Brown, 20 Wall. 289, 22 L. Ed. 264; Lincoln v. Sun Vapor Co., 59 Fed. 756, 8 C. C. A. 253; Meyers v. New York, 58 App. Div. 534, 69 N. Y. Supp. 529; Reed v. Anoka, 85 Minn. 294, 88 N. W. 981; 28 Cyc. 675. And in cases like the present, where the element of consideration is concerned, a liberal, and not a strict, construction should be placed upon the transaction. New Jersey v. Wilson, 7 Cranch, 164, 3 L. Ed. 303; New Jersey v. Yard, 95 U. S. 104, 24 L.

Ed. 352; Wisconsin & M. R. Co. v. Powers, 191 U. S. 379, 24 Sup. Ct. 107, 48 L. Ed. 229; Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. Ed. 941; Baltimore v. B. & O. R. R. Co., 6 Gill (Md.) 288, 48 Am. Dec. 537.

Second. Purchase at judicial sale.

The city's contention that the exemption from city taxes did not pass to and inure to the benefit of the railroad, is clearly without merit. The terms of the mortgage under which the railroad purchased were sufficiently broad to include what rights, privileges, and immunities the property had belonging to it, under the contract and deed for the exchange of the properties, and the railroad, as well as its predecessor in title, were purchasers for value thereof. In addition, the supplementary ordinances of 1865, 1867, and 1870 served to pass to the railroad the rights, privileges, and exemptions, along with all other rights and interests acquired by its predecessor under the contract and deed of June 8, 1855, in and to the property conveyed.

But the position is untenable for another reason. What was done as to the release of taxes was by commutation as above shown, and hence was a payment, and not a relinquishment, of the tax, and was the acquisition of property for valuable consideration, a contractual obligation binding on the city, which inured to the railroad, and which the former cannot escape from, or cast off at its will and pleasure, but which passed to the railroad as the purchaser of the property, and its rights thereto and title therein are protected under the contract and due process clauses of the federal Constitution. Cooley on Taxation (3d Ed.) p. 108, says:

"The pledge, in order constitute a contract, must have the elements of contract, and the vital elements are upon consent and consideration. * * * There must be something received by the city for the relinquishment, or something surrendered on the other side, which can be deemed a legal equivalent."

The same author, at page 126, further says:

"There is no room for any question, therefore, that when the state has stipulated by contract to give exemption from taxation, or has commuted an uncertain tax for a definite and fixed sum or sums, and afterwards undertakes to tax in the same manner as it taxes other subjects, persons, corporations, or property which was the subject of the exemption or commutation, the obligation of the contract is impaired."

In Stearns v. Minnesota, 179 U. S. 223, 21 Sup. Ct. 73, 45 L. Ed. 162, supra, the court recognized the difference between commutation of taxes and naked tax exemptions, at pages 233, 234 (21 Sup. Ct. 77), and decided that the federal court would for itself determine whether there had been any impairment of the contract, and whether the new company was entitled to the benefit of the commutation.

And at page 260 (21 Sup. Ct 87) Mr. Justice White, in a concurring opinion, stated that:

"Considering for a moment the ratified agreement which the gross receipt tax law embodied, it is patent that the duties which it imposed and the obligations to which it gave rise were in the strictest sense reciprocal or commutative; that is, that the agreement to pay the gross receipt tax, * * * was predicated on the obligation on the part of the state to regard the pay-

ment of said tax as the discharge by the corporation of all taxes due upon all its real or personal property."

See Wright v. Central of Ga. R. R. Co., 236 U. S. 674, 35 Sup. Ct. 471, 59 L. Ed. 781.

In Central of Ga. R. R. Co. v. Wright, 248 U. S. 525, 527, 39 Sup. Ct. 181, 63 L. Ed. 401, involving the validity of a tax exemption, and whether the same passed to a successor in title to the railroad property, at page 527 (39 Sup. Ct. 181) Mr. Justice Holmes said:

"The charter contracts in question are of a kind that goes back to the time when railroads were barely beginning and that would not be likely to be repeated, but of course will be carried out by the state according to what was meant when they were made."

In Phillips v. Portsmouth, a comparatively recent decision, it is held that a—

"provision of a contract between a city and a water company that the rental for water should be increased by the amount of any city tax on the company's property or works necessary for the supply of water was not an exemption of the property or works from city taxation, and hence the right to such increased rental passed to another company with which the contracting company subsequently merged or consolidated." Syllabus 3, Phillips v. Portsmouth, 115 Va. 180, 78 S. E. 651.

Third. The subject of laches.

That the city, the plaintiff in error herein, is estopped from making the defense now interposed in its behalf by reason of its previous conduct in respect to the transaction involved, and its laches and long acquiescence therein, seems too plain to admit of doubt. The contracts and undertakings were all entered into freely for a fair and full consideration, by parties competent to contract, with complete knowledge of all the circumstances and conditions surrounding the same, and which were lived up to and carried out in good faith, within their true spirit and meaning, from the year 1855 to the year 1894, a period of 39 years. In the latter year, and the year following, the right to claim the tax was first asserted, and promptly enjoined, and from the date of the injunction, and overruling of the city's demurrer to the bill, on the 13th of July, 1897, now more than 28 years, the same has remained unchallenged, the city failing to press its claim to the 2 years' taxes in question, or to assert its right thereto as to subsequent years.

A statute of limitation is one of repose. Courts of equity by analogy follow the statutes as to many matters, but in defenses peculiar to that tribunal, founded upon lapse of time and staleness of claims, they do not adhere strictly thereto. In such circumstances, courts of equity act upon their own inherent doctrine of discouraging, for the peace of society, antiquated demands, by denying relief where there has been gross laches in prosecuting rights, or long and unreasonable acquiescence in the assertion of adverse claims. Story's Eq. Jur. (14th Ed.) vol. 1, § 65, note 3, and cases cited, and volume 3, § 1972, note 2, and cases cited.

Every consideration requires that transactions should be concluded and ended within a reasonable time; otherwise, from the death of parties, the shortness of life, the frailties of human memory, the loss

and destruction of papers and documents, and the constant change in human events, all sorts and kinds of injustice will likely follow, and complete justice rarely be reached. Nothing can more certainly disturb the peace of society, and likely work more serious and disastrous results, than to keep open disputed transactions, once concluded and brought to an end, and as to which the actors and participators can no longer speak. This case affords a striking illustration of the necessity for a reasonable adherence to these rules, because, from the great length of time that has elapsed, there is danger of the grossest injustice being done.

While the limitation upon the time for the assertion of city taxes by suit is five years (chapter 30, § 33 [sec. 1055] Code W. Va. 1913), the effort is here made to uproot and annul a transaction closed 68 years ago, because it is alleged an illegal tax exemption entered into it. The actors in the transaction are all long since dead and gone, as well those actually participating therein, as those who acquiesced in and in good faith carried out the same for years and years after it was consummated. All of the conditions and surroundings tending to throw light on the reasons, purposes, and motives of the contracting parties have entirely changed. The city itself then was but a village, located in a lonely wilderness on the western frontier of Virginia, on the Ohio river, and the predecessor of the plaintiff railroad was a weak and struggling corporation, the hope and pride of Virginia and Maryland, looking to the building up and developing of those two great states, and the promotion and extension of a feeling of amity and good will between the eastern and western sections of the country.

During this long period, many and undreamed-of events have taken place. The country itself has been involved in three mighty wars; the state in which the city was located has, as a result of one of those conflicts, been cut in twain, and the city is no longer part of the state of which it formed a part, but of another and different state. Two generations of people have been born and lived. The section has developed beyond the anticipation of the most optimistic and hopeful, forming one of the highly developed and prosperous portions of the United States. Parkersburg is now a beautiful and prosperous city, and the Baltimore & Ohio Railway, the successor of the Northwestern Virginia Railroad, one of the strong and powerful railroad systems of the United States. The city, as a result of the wisdom and vision of those entering into the contract nearly three-quarters of a century ago, and now sought to be frustrated and annulled, is located upon one of the world's highways of commerce, stretching east and west thousands of miles. Assuredly the city's demand should not be acceded to unless there is the strongest consideration of law, justice, and right requiring it. No private litigant would be heard to assert such a claim, and the city should not, either from a legal or moral standpoint, be allowed so to do. In this litigation, the city stands just as a private citizen, is clothed with no garb of sovereignty that excuses it from its long failure to assert its rights, or its laches and acquiescence in what has occurred in connection therewith.

Boone County v. Burlington R. R. Co., 139 U. S. 684, 11 Sup. Ct. 687, 35 L. Ed. 319, was a suit in the United States District Court for

the District of Nebraska, in which the county of Boone sought to impeach a decree of that court on the ground of fraud, and the court denied the relief, adopting the statute of the state of four years limitation as applicable to the transaction. On page 693 of 139 U. S. (11 Sup. 690, 35 L. Ed. 319) the court said:

"The appellant seeks to apply to the county and its officers in this case the established rule that laches will not be imputed to a government for a failure on the part of its officers to perform their duty," citing authorities. " * * * But this doctrine is not extended to such a municipal corporation as the county of Boone." Metropolitan R. R. Co. v. District of Columbia, 132 U. S. 1, 11, 12. "The principle of ratification by laches or delay is as applicable to such a municipal corporation as it is to a private corporation or to an individual person," citing 1 Dillon on Municipal Corporations (4th Ed.) § 548 and cases cited.

The statute of limitations in Nebraska makes no exception in favor of such a municipal corporation as the county of Boone, and the doctrine of laches applies to it and to its board of county commissioners. It may be said in this connection that in the state of West Virginia the statute of limitations runs even against the state.

In Grymes v. Sanders and Others, 93 U. S. 55, 62, 63, 23 L. Ed. 798, a contract was sought to be rescinded on account of fraud and mistake; and the court at the last-named pages reviewed the subject generally, with authorities quoted, holding that to entitle one to such relief, it must be sought promptly after the discovery of the alleged ground of action; that delay and laches are fatal, and a court of equity would never entertain such a request unless the parties could be placed in statu quo.

In City of Savannah v. Kelly, 108 U. S. 184, 191, 2 Sup. Ct. 468, 27 L. Ed. 696, the city sought by introducing the defense of ultra vires to avoid its liability for obligations theretofore issued by it. The court, speaking through Mr. Justice Matthews, said:

"The authorities of the city at that time were only anxious to omit nothing which the most critical might regard as important in securing for its obligations all the weight and value properly belonging to an unquestionable pledge of its faith and credit; and certainly now, after the lapse of 20 years, in which no such question has been raised, it would, in the language of Mr. Justice Grier, in Mercer County v. Hacket, 1 Wall. 83, 'be contrary to good faith and common justice to permit them to allege a newly discovered construction of an equivocal power' "—citing Von Hostrup v. Madison City, 1 Wall. 291, 17 L. Ed. 538; Myer v. City of Muscatine, 1 Wall. 384, 17 L. Ed. 564; James v. Milwaukee, 16 Wall. 159, 21 L. Ed. 267.

In Wright v. Railroad, 236 U. S. 674, at page 678, 35 Sup. Ct. 472, 59 L. Ed. 781, the Supreme Court said:

"To decide whether these taxes are such an unjustified exaction we must turn to the legislation of the state, bearing in mind that the practical construction given * * * for nearly half a century is strong evidence that the plaintiff's contention is right."

See Central of Georgia R. R. Co. v. Wright, 248 U. S. 525, 527, 39 Sup. Ct. 181, 63 L. Ed. 401, supra.

In Stearns v. Minnesota, supra, 179 U. S. 223, at page 233, 21 Sup. Ct. 73, 77 (45 L. Ed. 162), the court, speaking through Mr. Justice Brewer, said in regard to a contract for commutation of taxes:

"As a preliminary matter, it is worthy of note that the alleged invalidity of this contract, in respect to taxation, was not complained of for 30 years. Whether the revenues of the state were benefited or injured by this method of taxation we are not advised, but it does appear that neither party challenged it. Both the railroads and the state accepted and acted under it for nearly a third of a century."

In Alpena Water Co. v. City of Alpena, 130 Mich. 518, 90 N. W. 323, the Supreme Court of Michigan, in construing the validity of a commutation of taxes, held that, the same having been acted upon by both parties for 20 years, that time was sufficient to conclude the controversy, if ever the same was to be ended.

In Luddington Water Co. v. Luddington the same court (119 Mich. 480, 78 N. W. 558) held a similar contract valid, and commented on the fact of its having been acquiesced in by the parties for a period of 16 years. On the subject of laches and stale demands, and the defense against the assertion of such claims, see 21 C. J. pp. 210, 211, 212, §§ 211a and 212b, and notes.

Fourth. Effect of injunction and overruling the demurrer.

The effort of the city to escape the consequences of the court's action in granting the injunction and overruling the demurrer, leaving the injunction standing, is perhaps natural, having regard to the necessarily serious consequences their conduct respecting these matters should have, in the light of the city's previous record of 39 years, in concurring in and carrying out the contracts and agreements sought to be vacated. Upon the assertion of the 1883 tax, as well as that of 1884, the collection of the same was promptly enjoined. Upon appropriate pleadings by demurrer and answer, exceptions to the answer by complainant, and motion to dissolve the injunction by the city, the case was heard and elaborately argued before Judge Goff, a native of West Virginia, perhaps its most distinguished citizen, thoroughly enlightened as to its institutions, its public policy, and laws, a noted judge of the country, and for some 20 years the presiding judge of this court, who, after full and mature consideration, on the 13th of July, 1897, overruled the demurrer, leaving the injunction in force. The city at this stage asked leave to file its answer to the amended and supplemental bill, bringing in the second year's taxes, which was granted, and but for which the case, having been fully submitted upon the pleadings aforesaid, would then have been finally determined upon its merits. The answer was filed on the 11th of August following. From that date no further action was taken in the cause, save as follows:

On the 11th of January, 1911, some 14 years later, by order, the city's attorney was permitted to withdraw the papers from the files of the court, with a view of inspecting them; and on the 17th of January, 1921, 10 years later, the cause, on ex parte application, was reinstated upon the docket, the same having been removed therefrom on the 9th of the previous January. No further action was taken to collect the two years' taxes in question, nor has any step ever been taken to collect any other or further tax. What happened in respect to the demurrer, was quite as significant. While availing itself on the 11th of August, 1897, of the right to file its answer to the amended bill as granted, the court having adjudicated the legal questions against it by overruling the

demurrer (Wisconsin & Michigan Ry. Co. v. Powers, 191 U. S. 379, 24 Sup. Ct. 107, 48 L. Ed. 229; Bowdoin College v. Merritt (C. C.) 63 Fed. 213, 215; Brown v. Fletcher [D. C.] 203 Fed. 70; 21 R. C. L. p. 529), which raised precisely the legal questions constituting the heart and substance of the ruling of the majority here, not a single move was ever thereafter taken in the cause for a period of 25 years, and even then the cause was brought up upon the ancient pleadings, save that on the 10th of January, 1923, some 29 years after the injunction was granted, the city moved anew to dissolve the same, which was, of course, denied.

Now, this entire course of the city had and could have had but one meaning, viz. that it abandoned its claim for taxes, and gave up its further defense to the suit. The failure to further prosecute the claim for the 2 years' taxes in suit, and to levy or assess and assert a claim for future taxes had necessarily this effect; and of course the failure to prosecute and offer proof of the facts set up in the answer for 14 years, and then to procure the papers from the record for inspection and keep them for more than 10 years, carries with it its own conclusive answer, and, as a consequence, what should now be done. This conduct, save upon the theory of abandonment of the suit, would have been but trifling with the administration of justice concerning a large, grave, and serious transaction, and would be true of any case, but particularly one involving an injunction, where action is most frequently taken upon a motion to dissolve. The suggestion of the city that the railroad perhaps was or should be held liable in part for the apparent failure to prosecute the suit is not justified. Nothing could be further from the fact. The railroad had procured the injunction desired, and upon the decision of the sufficiency of the bill upon demurrer, and retention of the injunction, no further action was necessary to be taken by it, the city having asked for and procured leave to file an answer to the amended bill.

For the railroad to have sought to speed the cause at this stage of the proceedings, or to have prodded the city into making other and additional assessments of taxes against it, would have been alike unusual as a matter of equity practice, and exceedingly imprudent and foolish from a business viewpoint. "Good faith and early assertion of rights are as essential on the part of a defendant in equity as they are on the part of the complainant." Brown v. Lake Superior Iron Co., 134 U. S. 530, 10 Sup. Ct. 604, 33 L. Ed. 1021. The propriety of granting an injunction, and the legal sufficiency thereof is generally tested upon motion to dissolve, and if the defendant wants to force action in this respect, the complainant presumably being content with the injunction where there is no limitation upon the running thereof, he makes such motion. The defendant, certainly after filing an answer, can always make this motion, though undue delay in so doing may prove a bar to such right. Antisdel v. Chicago H. C. Co., 89 Fed. 308, 311, 32 C. C. A. 216; 22 Cyc. 985, notes 82, 83; Clark v. Farrell, 86 Hun (N. Y.) 156, 33 N. Y. Supp. 324; Reilly v. Frias, 159 App. Div. 883, 143 N. Y. Supp. 869; Florence S. M. Co. v. Grover & Baker S. M. Co., 110 Mass. 1; Kerr on Inj. 565.

In this case, the city did make a motion to dissolve, which was in effect determined adversely to it, upon the court's overruling the demurrer, and leaving the injunction intact; and the failure at that stage to take further action, and to delay renewing its motion to dissolve until January of the present year, some 29 years later, speaks volumes, as its acquiescence in what took place in connection with the injunction, especially in the light of its previously sleeping 39 years on its right, is what must estop it from making further clamor respecting the subject-matter of the litigation. The city's long silence and acquiescence in the determination of the litigation against it must be taken and treated as an estoppel against it, and a waiver and abandonment of the right claimed. Kerr on Fraud and Mistake, pp. 291, 299, 301; National Mutual B. & L. Ass'n v. Blair, 98 Va. 495, 36 S. E. 513; Despard v. Despard, 53 W. Va. 443, 44 S. E. 448; Norfolk & Western R. R. Co. v. Purdy, 40 W. Va. 442, 21 S. E. 755; Hagerstown v. Hagerstown Co., 123 Md. 183, 91 Atl. 170, 7 A. L. R. 1239, Ann. Cas. 1916B, 1267; Grafton v. Patrick, 77 S. C. 420, 58 S. E. 1, 122 Am. St. Rep. 586; Bradford v. N. Y. Telephone Co., 206 Pa. 582, 56 Atl. 41; Edwards v. Cooper, 168 Ind. 54, 79 N. E. 1047; Lux v. Haggin, 69 Cal. 255, 4 Pac. 919, 10 Pac. 674; Connell v. Clifford, 39 Colo. 121, 88 Pac. 850.

Fifth. Liability of city to make restitution.

What is proposed to be done in this cause strikes at the very heart of the transaction, viz. that the long-standing agreement between the parties shall be annulled, the railroad required to pay full taxes, and the city to have the benefit of the contract between them, and to keep and retain all of the property and estate and money received by it under the avoided contract.

That it is difficult for me to appreciate the correctness of the conclusion of the majority, and to join therein, becomes manifest, when from my viewpoint the contract between the parties to the litigation is a plain and apparently perfectly fair and just one, entered into upon full and fair consideration passing between them at the time; the railroad certainly conveying much valuable real estate to the city, and making extensive improvements and outlay for it on account thereof, and subsequently paying a large sum of money in connection therewith. The transaction is a large and important one, based upon what was supposed and believed to be a valid and binding contract, that has withstood the test of years, and never until now, in the sixty-ninth year of its age, has any infirmity in it been judicially ascertained. Its very age entitles this contract to much consideration in determining its validity, especially when the one seeking to disturb its repose is a party to the original transaction, fully possessed of all information it now has, and has loitered and slept on its rights during the intervening years, until now it is doubly estopped from making its false clamor.

Like all contracts, its binding force and effect should not be lightly brushed aside. The Supreme Court, speaking through Mr. Justice Swayne, has aptly impressed upon all the sacredness of contracts in the following language:

"A compact lies at the foundation of all national life. Contracts mark the progress of communities in civilization and prosperity. They guard, as far as is possible, against the fluctuations of human affairs. They seek to give stability to the present and certainty to the future. They guage the confidence of man in the truthfulness and integrity of his fellow man. They are the springs of business, trade, and commerce. Without them, society could not go on. Spotless faith in their fulfilment honors alike communities and individuals." Farrington v. Tennessee, 95 U. S. 679, 682 (24 L. Ed. 558).

The effort here is merely to avoid the contract, not because of any fraud, mistake, imposition, or deceit entering into its inception, but because the city says it was ultra vires in so far as there was an exemption of city taxes given on certain property during its use by the railroad; and as a consequence it is asserted that the contract is wholly void, and the city cannot be required even to make restitution of whatever it received, or to return the property conveyed to it. Assuredly this cannot be true, even assuming there is any infirmity in the contract against which relief can or should now be afforded. The city is not exempt from the common obligation to do justice, and a legal liability springs from the moral duty to make restitution of that it should not have received, and to which it is not entitled, if the transaction is to be vacated. The city invokes the doctrine of ultra vires to prevent the enforcement of its own contract against itself. There is nothing suggested in the transaction involving moral turpitude; no intimation of any misconduct or default by the railroad company is made, but merely that the city exceeded its authority in what it did. In such cases, the law is entirely clear that a city cannot repudiate, as unauthorized, contracts under which it has received property, unless it surrenders the same.

In Chapman v. County of Douglas, 107 U. S. 348, 2 Sup. Ct. 62, 27 L. Ed. 378, involving a contract for the purchase of real estate, the court held it was ultra vires and void; but the city was required to make restitution of the property; the Supreme Court at page 355 (2 Sup. Ct. 68) saying:

"As the agreement between the parties has failed by reason of the legal disability of the county to perform its part, according to its conditions, the right of the vendor to rescind the contract and to a restitution of his title would seem to be as clear as it would be just, unless some valid reason to the contrary can be shown. As was said by this court in Marsh v. Fulton County, 10 Wall. 676, 684, and repeated in Louisiana v. Wood, 102 U. S. 294, 'the obligation to do justice rests upon all persons, natural and artificial, and if a county obtains the money or property of others without authority, the law, independent of any statute, will compel restitution or compensation.'"

In this same case, the Supreme Court, further considering the right of a corporation to escape liability from its contracts by reason of its own ultra vires acts, at page 357 (2 Sup. Ct. 70), quotes approvingly from Pimental v. City of San Francisco, 21 Cal. 362, the following language:

"The city is not exempted from the common obligation to do justice which binds individuals. Such obligations rest upon all persons, whether natural or artificial. If the city obtain the money of another by mistake, or without authority of law, it is her duty to refund it, from this general obligation. If she obtain other property which does not belong to her, it is her duty to restore it, or if used to render an equivalent therefor, from the like obliga-

tion. Argenti v. San Francisco, 16 Cal. 282. The legal liability springs from the moral duty to make restitution."

In Stearns v. Minnesota, 179 U. S. 223, at pages 261, 262, 21 Sup. Ct. 73, 87, 88 (45 L. Ed. 162), supra, Mr. Justice White said:

"My understanding does not permit me to doubt that to preserve in this case the contract in its entirety, so far as the rights of the state are concerned, and at the same time to destroy the reciprocal duty owed by the state to the other contracting party, is not to repeal, alter or amend the contract at all, but, whilst preserving it, to endeavor by an act of arbitrary power to impose a burden incompatible with the very provisions and terms of the amendatory act itself * * * the agreements being thus interdependent are of necessity indivisible, and to retain the entire duty or right of one party to the contract must lead to the preservation of the corresponding and reciprocal right or duty of the other."

In Whittaker v. City of Huntington the court of last resort in that state (West Virginia) strongly adheres to the views of the Supreme Court as stated. Manifestly a "corporation is as much bound by ordinary rules of honesty and by the terms of a valid contract as any other contracting party. * * * Even if it be conceded for the sake of argument, but not decided, that the defendant [city] cannot be required to perform what it has promised to do in the manner and to the extent promised, yet it seems clear on reason and principle that it cannot keep what it has lawfully obtained without restitution." 88 W. Va. 422, 107 S. E. 121.

It may be generally stated that courts of equity are exceedingly averse to granting relief to those seeking rescission or cancellation of contracts, where it is difficult to restore the status quo, by returning whatever has been received under the contract, and where it is impossible so to do, or by so doing would defeat the ends of justice, or work a legal wrong, it is considered sufficient reason for refusing relief in equity. Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798; Railway Co. v. McCarthy, 96 U. S. 258, 267, 24 L. Ed. 693; Hitchcock v. Galveston, 96 U. S. 341, 356, 357, 24 L. Ed. 659; Gay v. Alter, 102 U. S. 79, 26 L. Ed. 48; United States v. Norris, 222 Fed. 14, 137 C. C. A. 552; Marston v. Singapore Co., 163 Mass. 296, 39 N. E. 1113; Snow v. Alley, 144 Mass. 546, 11 N. E. 764, 59 Am. Rep. 119; Worthington v. Collins, 39 W. Va. 506, 19 S. E. 527.

In my judgment, the decision of the lower court should be affirmed.