MONTGOMERY et al., Appellants, *v.* FIRST NATIONAL BANK OF DILLON et al., Respondents.

(No. 8259.)

(Submitted December 1, 1942. Decided March 23, 1943. Amended Opinion Filed May 3, 1943.)

[136 Pac. (2d) 760.]

396

398

Messrs. J. E. Kelly, S. P. Wilson, H. L. Maury and A. G. Shone, for Appellants, submitted an original, a reply and a supplemental brief; Mr. Wilson and Mr. Maury argued the cause orally.

Messrs. Gunn, Rasch & Gunn, Messrs. Poore & Poore, Messrs. Gilbert & Gilbert and Mr. T. F. McFadden, for Respondents, submitted an original and a supplemental brief; Mr. Carl Rasch and Mr. J. A. Poore argued the cause orally.

HONORABLE RUDOLPH NELSTEAD, District Judge, sitting in place of Mr. Chief Justice Johnson, disqualified, delivered the opinion of the court.

Two orders of the district court of Beaverhead county in the probate of the estate of William Montgomery, deceased, are presented for review: (1) An order based on a petition of the First National Bank of Dillon and the Daly Bank and Trust Company of Anaconda, creditors of the deceased, directing the sale of the remainder of the decedent's real estate and personal property to pay their claims, and (2) an order settling the account of J. H. Gilbert as trustee of Montgomery's estate. The hearings on the petition for sale, the account

and a petition for the appointment of William G. Montgomery as administrator with will annexed, as successor of Gilbert, were consolidated in the trial court, and the testimony in connection therewith constitutes one record in this court. Appellant George H. Montgomery first commenced suit in 1931 in the United States District Court of Montana against Gilbert, the First National Bank of Dillon, and others, attacking, upon the ground of fraud, certain orders and decrees of the district court of Beaverhead county in connection with the administration of the estate. A decree dismissing this action was affirmed in 1935 by the Circuit Court of Appeals on jurisdictional grounds. (*Montgomery* v. *Gilbert*, 9 Cir., 77 Fed. 2d 39.) Thereupon the three appellants in the present proceedings, James K. Montgomery, George H. Montgomery, and William G. Montgomery, sons of the deceased, to whom was devised the real estate which the creditors now propose to sell, commenced separate suits against the same parties in the district court of Beaverhead county to recover the property of their father's estate, to quiet appellants' title thereto, and for an accounting. This litigation was finally terminated by a decision of this court in *Montgomery* v. *Gilbert*, 111 Mont. 250, 108 Pac. (2d) 616, in which remittitur to the district court was issued December 4, 1940. Pertinent facts previous to the commencement of the proceedings on which the present appeals are based appear in this court's opinion in *Montgomery* v. *Gilbert*, supra, including the material provisions of Montgomery's will and the fidings of fact and conclusions of law by the trial judge. A statement of the facts essential to the determination of the issues presented in the present appeals entails to some extent repetition of the facts set forth at length in the opinion in the prior litigation.

William Montgomery died October 24, 1919. His will was admitted to probate November 25, 1919, and Gilbert was then appointed executor of his estate. The claim of the Daly bank against the estate was approved by the executor for $34,760, and allowed by the court September 9, 1920. Several claims

400

by the First National Bank aggregating $94,518 were approved by the executor, and allowed by the court March 21, 1921. Between the date of the executor's appointment and the approval of his account in 1926 payments were made on these claims, but additional money was borrowed for expenses of administration and the ranching business. Montgomery's estate consisted of three ranches devised to the appellants, unimproved lots in the town of Wisdom, livestock, farm machinery and implements, and $40,000 in life insurance. William G. Montgomery, the oldest son, was foreman of the ranches until 1924. The last payment of family allowance to the widow was made in 1925 by four checks of $300 each. Previously, on November 26, 1923, the widow had deeded to the executor as partial consideration for money paid for family allowance certain lands which had been set aside to her after she elected to take her dower in lieu of the legacy in the will. So far as the record discloses, none of the decedent's family had any connection with the estate property or received any benefit therefrom subsequent to 1925. In February, 1926, after the disposition of the greater part of the livestock, the assets consisted of the three ranches, the town lots, farm machinery and certain other personal property. For a period of years thereafter the ranching operations were conducted by the executor personally and, in the later years, preceding the filing of his account now presented for review on appeal, the ranches were leased on a yearly basis for a cash rental.

During the time the executor occupied that position—from November, 1919, to April, 1941, a period of over twenty-one years—he filed three accounts. The first was approved May 24, 1924; the second, which has been referred to in prior litigation as his final account, was approved February 23, 1926; and the third—designated first account of trustee— from which one of the present appeals is taken, was approved July 1, 1941. We deem it appropriate to here emphasize the statement which has been made time and again in decisions of this court, that probate proceedings must be

conducted with dispatch to the end that an estate shall not be wasted by needless expense incident to delay. One who accepts appointment as executor or administrator of an estate occupies a position of trust, and particularly must be diligent in accounting so that the court, the heirs and other persons interested in the estate may be fully informed regarding the status of the estate property. The vigilance in this respect by one who assumes to act in such representative capacity must be greater where, by the terms of a will, particular confidence has been reposed by the testator and broad powers granted in the administration of the estate. It is true that circumstances over which the executor may have no control, such as adverse economic conditions, may prevent an early settlement of the estate. But by lapse of time, without accounting, evidence disclosing the true nature of the executor's transactions and his conduct of the estate is obscured and it becomes increasingly difficult to determine the truth.

An error in the trial court's findings in *Montgomery* v. *Gilbert*, supra, which findings appear verbatim in the opinion, page 257 et seq. of 111 Mont., page 619 of 108 Pac. (2d), concerning which from an analysis of the record there can be no controversy, should be noted at this point. Finding 28 recites that Gilbert was discharged as executor and his final account approved on February 23, 1926. Finding 30 states that, after his discharge as executor, he continued in control as trustee of the estate's property as directed in Montgomery's will. The fact is that Gilbert was not released and discharged as executor of the estate until April 23, 1941, and that the estate property was never set aside to him as trustee. He never accepted the trust created by Montgomery's will, nor did he qualify as trustee. The document dated February 23, 1926, which is designated Decree of Settlement of Account and Order Discharging Executor did not discharge Gilbert as executor. This order merely approved the account filed February 9, 1926, and provided further (1) that the balance of cash remaining in the hands of the executor be applied

by him as a payment on the debts due to the First National Bank of Dillon and the Daly Bank and Trust Company of Anaconda, and (2) that upon the payment of said sums the executor be discharged from his trust. No further proceedings were had in the probate of the estate until 1941. It is apparent from the record that both the executor and the two creditors considered the Montgomery estate closed in February, 1926, and that an account was filed in March, 1941, only by reason of the fact that this court in *Montgomery* v. *Gilbert,* supra, ordered the executor to file one.

In May, 1925, the executor made two fictitious probate sales of the ranches. (See trial court's findings 19 to 23, inclusive, in *Montgomery* v. *Gilbert,* supra, 111 Mont. pages 263-265, 108 Pac. (2d) pages 622, 623.) A portion of the land was ostensibly sold to Alfred N. Peterson for $82,665.20, and the remainder to George M. Clemow for $41,749. In August, 1925, Clemow deeded part of the land conveyed to him to Jules Wenger for $15,630.93, which sum was paid in cash to the executor, and listed among the receipts in his account. Peterson and Clemow thereupon mortgaged the remainder of the lands not conveyed to Wenger to the Federal Land Bank of Spokane for $50,000. The creditors acknowledge in their petition for sale of the property that $33,000 of this amount was applied on the claim of the First National Bank, and $15,000 on the claim of the Daly bank. The executor never received any consideration for the conveyances to Clemow and Peterson. From finding 23 in the prior litigation it appears that the executor followed this procedure in order to secure money by way of a loan to apply on the indebtedness to the two creditors. On October 15, 1925, Peterson and Clemow each signed deeds describing all estate lands excepting the parcel conveyed to Wenger, in which the names of the grantees were omitted and left blank, and delivered them to the executor. The lands were at no time reconveyed to appellants, who have been the owners thereof since their father's death. It is elementary that the real property of a deceased person

vests in his devisees "from the moment of his death, subject only to the right of the executors to posesssion for the purposes of administration." (*First State Bank* v. *Mussigbrod*, 83 Mont. 68, 85, 271 Pac. 695, 702; *In re Estate of Deschamps*, 65 Mont. 207, 212 Pac. 512.) In explanation of the above procedure the executor, at the hearing in April, 1941, testified on direct examination as follows: "The reason for taking them in that manner was, that we anticipated a sale of the properties. I had a verbal understanding with the parties that gave me the deeds to insert in the name of the purchaser. As I recall it, we were going to save the amount of revenue stamps. In my opinion, I was holding them as security for the creditors and the heirs; and that is as near as I can interpret what I intended to do with them." To the following question on cross-examination: "If that transaction had gone through, and if you had sold the lands to some purchaser that you had in mind, then those deeds would have been delivered without any further order of court, and without any further publication for bids. Is that true?" the answer was: "I would have determined my status in that, but that was my interpretation of what I intended to do with them." In the executor's account, approved by the order dated February 23, 1926, the property of the estate was treated as sold, and the cash assumed to have been received therefor applied on the claims of the creditors. The order also clearly indicates that the creditors had agreed to such arrangement.

Clemow died April 13, 1933, and his estate was thereafter probated in Beaverhead county. At the time of the hearing on the petition for sale in April 1941, quitclaim deeds to J. H. Gilbert, trustee, from Alfred N. Peterson and from the heirs of George M. Clemow, each dated March 24, 1941, and filed for record April 21, 1941, were received in evidence. Assuming that these deeds were sufficient to properly reconvey the lands in question, it appears from the record that for a period of over fifteen years title was held by third persons, who were mere "dummy" purchasers and had no interest in

the estate. At the hearing the appellants offered to prove that the Daly Bank and Trust Company, through its president, requested the executor to make the sales to Peterson and Clemow in the manner in which he did, and that the executor as president of the First National Bank of Dillon, as well as all of the other directors of the bank. agreed to the plan. Such testimony was competent, not to prove fraud— the good faith of the parties was established in the prior litigation—but as bearing on the question raised by appellants' objections to the petition for sale of property, whether the creditors' claims were then barred by laches. It is apparent, however, from other testimony admitted, that the creditors, through officers and directors, actively participated in all of these transactions, which, although made in good faith, were clearly contrary to law. The creditors planned the sales to Peterson and Clemow; they were responsible for the mortgage on the real property to the Federal Land Bank in order to secure funds to apply on their claims; they acquiesced in the action of the executor in withholding reconveyance of the property to the estate, and in the litigation in *Montgomery* v. *Gilbert*, supra, they contested the title of the heirs. The identity of interest of the executor of the estate and the creditors is very apparent from the record. In 1925 and for some time thereafter the president of the Daly bank was a director of the First National Bank. The executor during this period was president of the First National Bank. W. W. Hawkins, field man for the First National Bank in 1919, vice-president of the bank at the time of the sales to Peterson and Clemow, and subsequently president, had direct supervision of the ranches during the time they were leased on a yearly basis. He testified that to his knowledge tax notices since 1935 were in the names of Peterson and Clemow and sent to the First National Bank. Subsequent to this latter date the executor did not visit the ranches on an average of more than twice each year. According to the testimony of William G. Montgomery, which is not contradicted, the exec-

utor advised him after the youngest brother George became of age in 1931, that the estate property had been "taken up" to pay debts. It serves no useful purpose to review the evidence in detail because it is clear that the creditors at all times had an intimate connection with, and had complete knowledge of, the business of the Montgomery estate through their respective officers.

In their objections to the granting of the creditors' petition to sell, appellants have pleaded that the creditors' claims are barred (1) by statutes of limitations—subd. 1, sec. 9028, secs. 9029 and 9041, Revised Codes 1935—and (2) by the creditors' laches. At the trial appellants objected to testimony relating to the indebtedness then claimed to be due to each of the creditors, specifying error on this appeal from adverse rulings of the trial court.

1. *Limitations.* Under the statutes of Montana, claims against the estate of a deceased person, duly approved, are not liens on the property of the estate, and no execution for their enforcement can issue. They are merely acknowledged debts payable in the course of administration. (Secs. 10177 and 10185, Rev. Codes 1935.) Chief Justice Brantly, writing the opinion in *In re Tuohy's Estate,* 33 Mont. 230, 83 Pac. 486, 491, said that "when claims have been presented and allowed, and are not contestable, for the reason that they have not been presented in time, under section 2603, supra [now sec. 10173, Rev. Codes 1935], or that they are barred at the time of presentation by the particular statute applicable, none of the statutory limitations run as against them." Reasons for this rule are enumerated in the opinion in *In re Estate of Schroeder,* 46 Cal. 304, cited with approval in the *Tuohy Case.* It may, therefore, be definitely stated as settled law in this state that statutes of limitations have no application to creditors' claims in probate which have been approved by the personal representative and allowed by the court.

2. *Laches.* Is the defense of laches permissible in a [6] ceeding to enforce the payment of an approved claim

against an estate by the sale of the decedent's property? If it is, does the decision in the prior litigation (*Montgomery* v. *Gilbert*, supra) bar resort to it as a defense in the case now under consideration? In answering the first question in the affirmative we quote the language of the Supreme Court of California in *Re Estate of Crosby*, 55 Cal. 574, 584; "But while, under our system, the Statute of Limitations may not apply, every consideration arising from the evident intention * * * that proceedings for the settlement of the estate should progress with all reasonable dispatch, and that the Probate Judge should employ a discretionary power to deny a petition for the sale of real estate where unreasonable delay has occurred, should have full force and vigor. * * * From the very nature of the proceedings and the character of the duties imposed upon courts where the estates of deceased persons are administered, * * * courts of probate retain the power, and it is their duty, to refuse an order granting leave to sell, when the delay amounts to laches." Citing the decision in the Crosby case, that laches is available in proper cases as a defense, Chief Justice Brantly says in *In re Tuohy's Estate*, supra, [33 Mont. page 247, 83 Pac. page 491] : "Contention is made that the court, in the exercise of its sound discretion, should have denied the application on the ground of the palpably unreasonable delay of the executor in presenting it. Whether or not gross negligence or palpable laches on the part of the executor or administrator is sufficeint reason for denying an order of sale in a given case, we do not deem it necessary to discuss or decide. There is abundant authority in support of the affirmative of the proposition. ([*In re*] *Estate of Crosby*, 55, Cal. 574; *Mooers* v. *White*, 6 Johns, Ch., [N. Y.], 360; *Wolf et al.* v. *Ogden*, 66 Ill. 224; *McCrary* v. *Tasker*, 41 Iowa 255; *Ricard* v. *Williams et al.*, 7 Wheat. 59, 5 L. Ed. 398; *In re Allen*, 15 Mass. 58; 2 Woerner on the American Law of Administration, sec. 465.) The policy of the statute requires the administration to be conducted speedily to a close."

Respondents contend that it was definitely decided in *In re*

*Stinger's Estate,* 61 Mont. 173, 201 Pac. 693, 700, that the defense of laches cannot be invoked at all. The language in the opinion relied upon to sustain this argument reads: "The obligation to settle the estate and pay the claims rests upon the administrator, and while the owners of the claim may take action to expedite payment of his claim where there has been unreasonable delay in the administration, yet that is not obligatory upon him, but he has a right to assume that the administrator will pay claims in the due course of administration when the estate is in a condition for such payment." As applied to the facts in the *Stinger Case* this statement is undoubtedly correct. But it cannot be given so broad an interpretation that it excludes in a proper case consideration of unreasonable delay caused by the creditor himself.

Neither does the decision in *Montgomery* v. *Gilbert,* supra, deprive appellants of the right to object to the granting of the petition for sale of the property on the ground of the creditors' laches. The statement on rehearing that the petitioners' claims could only be discharged by payment was not within the issues presented to the court on that appeal. Although the indebtedness to the creditors was determined in the order approving the account dated February 23, 1926, nevertheless, appellants in the present proceeding were entitled to their day in court. A proceeding for the sale of real estate in probate is in the nature of an action of which the presentation of the petition is the commencement and the order confirming sale is the final judgment. (*In re Ryan's Estate, ante* p. 281, 134 Pac. (2d) 732.) Before such a petition may be heard by the court an order must be issued directing all persons interested to appear and show cause, (sec. 10212, Rev. Codes), and service of the order must be made as required by section 10213. At the hearing the heirs have a right to oppose the sale and to be heard. "At such hearing they may offer any evidence tending to show that the sale is unnecessary, and since a necessity for the sale is the only condition upon which it may be ordered, if they

are successful in their contention the court is without authority to make the order. For example: Upon the hearing the heirs may contest the validity of the claims which constitute the indebtedness upon the existence of which the petition to sell is based (*Beckett* v. *Selover,* 7 Cal. 215, 68 Am. Dec. 237; [*In re*] *Schroeder's Estate,* 46 Cal. 304; [*In re*] *Crosby's Estate,* 55 Cal. [574], 582); or they may be able to show that the realty is yielding income sufficient to discharge all valid claims or to pay them in part, and thereby either dispense with the necessity for a sale altogether, or reduce the amount of the realty to be sold (*Haynes* v. *Meeks,* above [20 Cal. 288]); or they may be able to convince the court that the best interests of the estate will be served by borrowing the money (sec. 7547, Rev. Codes), or mortgaging the property instead of selling it (sections 7600, 7601); * * *.'' (*Lamont* v. *Vinger,* 61 Mont. 530, 541, 202 Pac. 769, 772.) In addition, the heirs may present any other defense available to them, including laches.

Laches is a doctrine of equitable cognizance and has existed since the beginning of equity jurisprudence. It may be considered by a probate court as a necessary incident to the powers expressly granted to it. "There is no absolute rule as to what constitutes laches or staleness of demand, and no one decision constitutes a precedent * * * for another; each case is to be determined according to its own particular circumstances." (30 C. J. S., Equity, sec. 115.)

Laches is negligence or omission seasonably to arrest a right. "The idea is embodied also in the words 'acquiescence,' 'election,' 'estoppel,' 'abandonment,' 'ratification,' and 'waiver'." (19 Am. Jur., Sec. 493, page 340.) This court in *Riley* v. *Blacker,* 51 Mont. 364, 370, 152 Pac. 758, 759, made the following statement: "Laches, considered as a bar independent of the statute of limitations, is a concept of equity; it means negligence in the assertion of a right; it is the practical application of the maxim, 'Equity aids only the vigilant;' and it exists when there has been unexplained delay of such dura-

tion or character as to render the enforcement of the asserted right inequitable." As said by the Supreme Court of the United States: "We need only refer to the many cases decided in this court and elsewhere, that a neglected right, if neglected too long, must be treated as an abandoned right which no court will enforce. [Citing cases.] There always comes a time when the best of right will, by reason of neglect, pass beyond the protecting reach of the hands of equity, and the present case fully illustrates that proposition." (*Moran* v. *Horsky*, 178 U. S. 205, 20 S. Ct. 856, 857, 44 L. Ed. 1038.)

The petition for sale of the decedent's property in the present proceedings was filed February 15, 1941—over twenty-one years after the admission of Montgomery's will to probate and the appointment of the executor. Almost sixteen years had elapsed since the fictitious sales to Peterson and Clemow in 1925, during which time title to the estate lands remained in the names of third persons who had no interest in the estate. No attempt is made to excuse the unusual procedure whereby the estate property was alienated for this period. None can be given. The death of Clemow in 1933 further complicated the condition of the title. Had the names of proper grantees been inserted in the deeds from the two ostensible purchasers in 1925, and these deeds immediately recorded, the intention to preserve the property for the heirs as well as the creditors could have been urged with more consistency, and the creditors would now be in a more favorable position to meet the charge of laches. But the conduct of the creditors subsequent to 1925 leads to a definite conclusion that the right given them by statute to sell the property at probate sale was voluntarily abandoned. That the heirs of Montgomery suffered detriment cannot be questioned. During a period of over fifteen years subsequent to 1925 they received no benefit from the estate property. The real estate had been encumbered by a mortgage of $50,000, and its title placed in the names of third persons who had no interest in the estate. In the meantime the creditors' original claims more than doubled

410

because of accrued interest. The appellants were compelled to carry on litigation, which, although it did not establish fraud, did determine that the procedure followed by the creditors and the executor was contrary to law. Only by reason of this litigation was the property restored to the estate. It is reasonable to conclude from a consideration of the entire record that, if appellants had not instituted the prior litigation terminating in the decision in *Montgomery* v. *Gilbert,* supra, no proceedings would ever have been taken by the creditors to seek payment of their claims by petitioning for the sale of decedent's property.

Respondents attempt to excuse their delay on two grounds: (1) That they were prevented from asserting their right to sell by appellants' acts in commencing the prior litigation, and (2) that the right is given by statute to the heirs as well as to the creditors to petition for the sale of the property if the executor neglects to act, and therefore the heirs cannot urge laches as against the creditors. Respondents argue that the right conferred on a creditor by statute, (sec. 10219, Rev. Codes), to sell decedent's property to satisfy their claims, is optional and not obligatory, that there can be no laches where there is no duty to act, and that such is the general rule stated in the *Stinger Case.* But this argument fails to take into consideration the facts peculiar to the present case. The devisees could not petition to sell because title to the property was not in the estate. That the executor did not intend to follow the law regarding probate sales is clear from his own testimony. Because of his relationship with the creditors as an officer and director, the creditors in effect controlled the disposition of the estate property. The creditors' delay in petitioning for the sale of the property in probate was not due to litigation commenced by the appellants, but it was due to the fact that the creditors had no intention until after the decision on appeal in *Montgomery* v. *Gilbert* in 1940 of presenting any such petition at all. Prior to this decision the creditors were satisfied with the procedure adopted by

the executor, and in the previous litigation defended his position as well as their own in that regard.

Respondents present the argument that they were not guilty of any delay of which appellants were not equally guilty; that therefore neither can avail himself of the delay by the other as laches (citing *City of Parkersburg* v. *Baltimore & O. R. Co.*, 4 Cir., 296 Fed. 74, 75; *Charleston Library Society* v. *Citizens & South National Bank*, S. C., 23 S. E. (2d) 362; *Marshall* v. *Meyer*, 118 Iowa 508, 92 N. W. 693). By section 10210, Revised Codes, 1935, when a sale of property is necessary to pay a decedent's debts, the executor may obtain an order of sale. If the executor neglects to apply for an order of sale when it is necessary, "any person in interest may make application therefor." (Sec. 10219, Rev. Codes.) It is true, as argued by respondents, that appellants as devisees are given by this statute the same right as creditors to apply for an order of sale to pay decedent's debts, but their failure to do so is not justification for delay by the creditors. "The proceeding for the sale of real property is hostile to the heirs, and there is no principle which makes it their duty to initiate a suit adversely to themselves, the failure to commence which by the property party may result to their benefit." (*In re Estate of Crosby*, supra, 55 Cal., page 585.) In any event, a sale of the property on petition of Montgomery's heirs would have been ineffectual because at no time after the transfers to Peterson and Clemow in 1925 was the title to the property in the estate, but it remained in the names of third persons until the time of the hearing on the creditors' petition for sale in April, 1941.

The additional argument is advanced that because of the ▉ first provision of Montgomery's will authorizing the executor to borrow money to operate the ranching business and to pay debts and make the payment of such loans a charge against the estate, it follows that the creditors have a lien on the estate property which cannot be barred by laches. We do not understand that the word "charge" as used in the will

has a meaning different from its use in section 10195, Rev. Codes, by the provisions of which all of the property of the decedent is chargeable with the payment of his debts. As heretofore observed, by the statutes of Montana, claims against an estate in probate, whether they be duly approved, or rejected but judgment subsequently rendered in favor of claimant in suit thereon, are not liens upon the property of the estate. They are merely acknowledged debts payable in the course of administration. (Secs. 10177, 10185, Rev. Codes.)

Reference has been made to certain testimony given at the trial in *Montgomery* v. *Gilbert*. Section 9745, Revised Codes, provides what constitutes the record on appeal from an order in probate. The testimony in the prior litigation is not a part of the present record. Although we do not see wherein it has any bearing on the issues presented by respondents' petition to sell and appellants' objections thereto, nevertheless, if it has, we may not look to that testimony for the purpose of supplying facts not presented in the record for review in the present proceeding. (5 C. J. S., Appeal and Error, p. 121, sec. 1481; *Jones Hardware Co.* v. *Telford*, (Tex. Civ. App.), 63 S. W. (2d) 735; *Soper* v. *Foster*, 256 Ky. 157, 75 S. W. (2d) 1080; *Catts* v. *Phillips*, 217 Ala. 488, 117 So. 34.)

In view of all the facts and circumstances, we are of the opinion that the creditors have voluntarily abandoned any right given them by statute to sell the estate property at probate sale, and that their claims are barred by laches.

*The final account.* This report covers the period from January, 1926, to March, 1941. During this time the total receipts were $357,475.67. the disbursements $351,109.77. The balance in the sum of $6,365.90 was delivered to the administrator with will annexed on the approval of the account.

Considerable time has been devoted to an examination of the account. We have concluded that the order approving it should be affirmed, excepting as to the two creditors' claims, which we hold to be barred by laches.

Appellants charge the executor with fraud. Alleged fraudulent transactions with reference to the estate property are not now open to question. The orders approving accounts dated May 24, 1924, and February 23, 1926, are conclusive as to matters prior to those dates. (Sec. 10303, Rev. Codes 1935.) Aside from this fact, however, charges of fraudulent transactions by the executor were litigated in *Montgomery* v. *Gilbert*, supra, decided by the trial court March 28, 1938. It was there adjudicated that there was no actionable fraud in the administration of the estate. It is argued, however, that if this decision is *res adjudicata,* it is so as to the three appellants personally and in their individual capacities, and not as to William G. Montgomery, as administrator with will annexed. The answer to this argument appears in the general rule stated in 1 Freeman on Judgments, 5th Ed., par. 421; "And where a party, although appearing in two actions in different capacities, is in effect litigating the same right, there is in effect the requisite identity of parties, and the former adjudication is *res judicata.*"

The order approving the account is affirmed excepting as to claims of the First National Bank of Dillon and the Daly Bank and Trust Company, which are barred by laches. The order directing the sale of the estate property is reversed with direction to dismiss on the merits the petition therefor.

ASSOCIATE JUSTICES ERICKSON and ANDERSON, and the HONORABLE GUY C. DERRY, District Judge, sitting in place of MR. JUSTICE ANGSTMAN, concur.

MR. JUSTICE MORRIS:

I dissent. This cause was first tried in the United States District Court for the district of Montana, determined adversely to the plaintiffs, and appealed to the Circuit Court of Appeals of the Ninth Circuit. The conclusions of the Circuit Court, canfirming the district court in the federal jurisdiction, may be aptly summarized by one expression in the

opinion of the Circuit Court of Appeals, which was "Appellant has not made out a case for the intervention of a court of equity under the jurisprudence of Montana." (*Montgomery v. Gilbert*, 9 Cir., 77 Fed. (2d) 39, 45.) Failing to obtain any relief in the federal courts, the plaintiffs on June 15, 1935, commenced an action in the district court in and for Beaverhead county. That action was on trial and under consideration by the trial court for practically a year. Extended findings were made and the district court, presided over by the Honorable William L. Ford of the Ninth Judicial District, held that the plaintiffs were not entitled to any relief. From that decision the matter was appealed to this court. We affirmed the district court. (*Montgomery v. Gilbert*, 111 Mont. 250, 108 Pac. (2d) 616.) We remanded the case however to the lower court for the reason that the sale of the real estate had not been made in accordance with the statute, and directed that such sale and final report of the trustee should be made in accordance with probate procedure.

Pursuant to that opinion, the trustee filed his final account, prayed for its approval and at the same time petitioned for an order authorizing the sale of the balance of the assets of the estate for the purpose of paying the obligations of the estate that had been approved by the executor and the court. After an extended hearing requiring a transcript of approximately 1,000 pages when brought here on appeal, the trial court approved the account and issued its order directing the sale of the real estate as prayed for. The plaintiff again appealed to this court and the majority opinion is the judgment of this court on this last appeal.

In all the actions mentioned that were tried in both the federal and state courts, the pleadings and arguments of the plaintiffs were predicated upon the alleged fraudulent administration of the estate by the executor and conspiracy between the executor and a Dillon bank, one of the defendant creditors to defraud the estate, and it was alleged that conversion of assets of the estate by the executor and the defend-

ant bank of the value of approximately a quarter of a million dollars had been accomplished. In none of the actions mentioned were the plaintiffs able to sustain in any particular any such allegations, and even the majority opinion in the instant action affirms the lower court in regard to all such questions of fraud and deceit and conversion, but the majority hold that by reason of long delay in having the assets sold and disposed of to pay the obligations which had been approved by the executor and the court as legal claims against the estate, the defendant creditor banks were guilty of laches and not entitled to recover the respective amounts due them.

It is conceded that the errors in administering the trust by the executor were made in good faith, and that no fraud or collusion with the defendant banks to defraud the estate, or convert any of the assets to their own use, has been shown. In other words, the matter is now before this court stripped of all the lurid allegations relative to dishonesty and fraud on the part of the executor, and the sole matter that we have to determine is whether the creditors have been guilty of laches in not forcing a sale of the assets to pay their claims at an earlier date. Let us see to what extent the question of laches is involved in this action, and if there were laches chargeable to any party in interest, who that party is.

The consolidated actions that were tried in the district court of Beaverhead county, with the Honorable William L. Ford presiding, were later appealed to this court (111 Mont.) as referred to above. The presiding judge at that time made findings of fact that are clearly supported not only by substantial evidence which under the established rule is sufficient to sustain his judgment, but such findings are sustained by clear preponderance of the evidence, and by a long line of decisions of this court are binding on appeal. The questions determined in the prior action in this court, are, of course, *res judicata,* except as to the one question of laches, but the merits of the action before us cannot be fully grasped without a careful review of the former action. To accomplish that

purpose certain findings by Judge Ford and portions of the testimony received in that trial are recited here.

In Finding No. 11 it was said that William G. Montgomery, the principal plaintiff in the case at bar, "was of age at the time of his father's death, and had been foreman in the operations of the properties of said estate under his father, *and continued to act as such foreman and superintendent of said operations after his father's death, under said defendant, J. H. Gilbert, as executor, until the month of August, 1924, and during said time said William G. Montgomery, and his mother, the said Cecelia L. Montgomery, the surviving widow of said deceased, had full charge of, and control over, all of the operations of the properties of said estate under the supervision of said defendant, J. H. Gilbert, as such executor.* That during all of said times the operations of said property were properly and efficiently carried on and conducted by said William G. Montgomery and the said Cecelia L. Montgomery under the supervision of said defendant, J. H. Gilbert, as such executor."

The executor had his office and place of business at Dillon, some sixty miles from the headquarters ranch which was located in the Big Hole, and the Big Hole is not readily accessible to outside points at all times of the year, and at all times the actual physical possession of all the assets of the estate was under the direct control and supervision of William G. Montgomery, the eldest son of the testator, who was foreman of the ranch, looked after the livestock, haying and all matters of ranch management, kept the time of the help, and when an employee was discharged or was paid any wages the checks were drawn by Cecelia L. Montgomery, the widow of the testator. The evidence is too clear to admit of dispute that the widow and the eldest son ran the ranches practically unrestricted, contracted all obligations relative to ranch expenses, and the executor had very little to do about expending the funds of the estate. His principal function in the premises appears to have been to see that funds were always available to take care of the checks issued by Mrs. Montgomery for

expenses and obligations incurred by herself and her son as foreman.

Five years or more following the death of the testator, the executor, in accordance with the express command of the testator set forth in his will, permitted the widow and the eldest son to continue to run the ranches in practically the same manner as they had been run by the testator in his lifetime. What was the result?

When the account of the executor was before the district court for approval in 1924 the account was approved and allowed, but the court found the estate to be insolvent and so stated in its order approving the account. This was the financial condition of the estate brought about under the direct management of William G. Montgomery, the son, and Cecelia L. Montgomery, the widow. None of the heirs, either at the time the account of the executor was pending before the court awaiting approval or rejection, or at any other time, challenged any part of the report as submitted, nor excepted to the court's finding that the estate was insolvent. Under such circumstances how can it be said that there is any laches chargeable to the creditors which the record does not show was equally and probably more chargeable to the heirs?

As evidence of the full and complete knowledge of the heirs as to the affairs of the estate, attention is called to the agreement made July 17, 1923, between Mrs. Cecelia Montgomery, the widow, and J. H. Gilbert, the executor. No one can read that document, which was prepared by Mrs. Montgomery's own attorney and executed by her and the executor in the presence of William G. Montgomery, one of the heirs and a plaintiff, and reach any other conclusion. That document appears in Volume 5 of the transcript in the consolidated actions beginning on page 1031, and by its very terms and expressions clearly expresses the concern of both parties as to the solvency of the estate at that time. It is recited in that document that the estate is solvent, but it also sets forth that the indebtedness of the estate at that time to the First Na-

418

tional Bank of Dillon was approximately $173,000. In the preamble of that document signed by Cecelia L. Montgomery and its terms discussed and approved in the presence of William G. Montgomery, it is stated: "The said second party has acted as manager of the property and livestock interests in the Big Hole Basin for the executors of said estate * * *." The second party to that agreement was Cecelia L. Montgomery. It is further recited in the preamble of that document that "The said parties hereto are desirous of entering into some mutual agreement so that the said ranch may be operated and if possible sold to the best advantage of the creditors and legatees of the estate." It is specified further in that document that the parties agree that the second party was indebted at that time to the estate in the sum of approximately $22,709.40, and some years later it was reported that the indebtedness of Cecelia L. Montgomery to the estate was some fifty odd thousand dollars for household and family expense for herself and her children. Those matters were determined long ago and are not now contestable. Their correctness is vouched for over the signature of Cecelia L. Montgomery.

As further evidence of the full and complete knowledge of William G. Montgomery and his mother, William G. Montgomery testified on cross-examination as follows:

"Q. Before your father died who kept the time on the ranch? A. I did.

"Q. And you kept it correctly? A. Yes.

"Q. After your father died did you continue to keep the time? A. Yes, except for the checking; I didn't do the checking.

"Q. Your mother drew the checks and signed the checks and those checks came into the First National Bank of Dillon? A. Yes. * * *

"Q. And they were cashed at the First National Bank of Dillon; that is the only place they could be drawn on? A.

They went through the regular course the same as they always had.

"Q. Isn't it also true that your mother requested the vouchers later on to be returned to her for her checking over? A. The vouchers went to the bookkeeper, as I understood, and then they came back to the ranch to be checked against the time book.

"Q. And while they were so being checked against the time book your mother retained those vouchers? A. They were stored at the ranch; they were never called for so they remained there in a box in a desk. * * *

"Q. As to the money, were you aware of your mother having spent money belonging to the estate? A. Yes, she had the checkbook and drew checks whenever she wanted money, or deemed it necessary.

"Q. When did she do that? A. From the time even before my father died, she sometimes checked; and then after my father died she started and drew *all* the checks.

"Q. From the time your father died she drew all the checks for how long a time? A. All the time I was on the ranch. except that Mr. Gilbert drew at the bank, as executor. *Of course, he would draw none for the ranch expenses;* they were drawn by my mother as the necessity arose.

"Q. Did your mother draw checks for the maintenance of the family, the food they ate and the clothes they wore, and their schooling? A. Yes.

"Q. And were you aware of any of those checks being dishonored or refused or not paid? A. No.

"Q. Were you aware of any restriction upon your mother as to the number of checks she might write, or the amount? A. She was supposed to write as few as possible to hold the expenses as low as possible.

"Q. But the actual checks she did write was to be controlled by her judgment in the matter. A. Yes."

He further testified that after his father's death his mother's

brother, Angus Clark, who was foreman at the Dudley and Ajax ranch, was paid $2,625 for back wages due him at the time the father died, without the account first being approved by the court. And likewise an account due the Basin Mercantile Company for $6,958.36, and other accounts payable, were paid by check by the mother without first being approved by the court. Mrs. Mary Montgomery, also referred to as Mrs. William Montgomery, and as Cecelia L. Montgomery, in the transcript in *Montgomery* v. *Gilbert,* supra, testified relative to the sale of the ranches:

"Q. When you say that Mr. Gilbert and Mr. Hazelbaker— if you did say that—forced you to sign some papers or deed in Anaconda, what do you mean by that? A. I don't say they forced me; I said they told me I had made an agreement and I would have to sign that paper in addition to the ones I had already signed.

"Q. You don't mean to convey the idea they threatened you or anything like that? A. I don't suppose they would hurt me.

"Q. You were a free agent weren't you? A. Well, I don't know whether you would call it that or not.

"Q. You were except for your indebtedness like lots of us— you were a free agent? A. For the ranches' indebtedness, not mine.

"Q. That is true isn't it, they were trying to arrange some way to clean up this indebtedness and you were willing to cooperate in trying to do that? A. I certainly was. My husband always paid his bills.

"Q. That is the reason you tried your best to meet these obligations? A. I thought I was trying my best.

"Q. You did try your best didn't you. A. I don't know.

"Q. And while on the ranch you conducted it in that respect just as you always did? A. I worked there twenty-eight years.

"Q. Mr. Gilbert, as far as you can tell the Court, did his

best to help? A. I thought he was doing his best the same as I was.

"Q. You thought that during all the time you were on those ranches? A. I certainly did.

"Q. And you were there continually? A. It was my home."

For further evidence of the full and complete knowledge of all that was being done in regard to the ranch, its finances and its management, we turn again to the findings of the Honorable William L. Ford, the trial judge. Finding No. 12 of the trial court was as follows: "That both the said William G. Montgomery and Cecelia L. Montgomery were fully advised and had full knowledge of the outstanding and unpaid claims and accounts incurred by the deceased during his lifetime for labor, provisions, and supplies in the operation of his properties and ranches, and for family, household and other purposes, and the amounts due and payable thereon. That *all of said claims and accounts were audited and approved for payment by the said Cecelia L. Montgomery, and payment thereof directed by orders or requisitions in writing upon the said defendant. J. H. Gilbert, as such executor, and the vouchers, evidencing such payments down to the 21st day of February, 1921, were returned to said Cecelia L. Montgomery,* who had them in her possession at the time of the filing of said executor's first account of his administration of said estate on the 13th day of May, 1924, and which account was settled, allowed and approved by this court on the 24th day of May, 1924."

Finding No. 13 was as follows: "That within the time prescribed by said notice to creditors, duly verified claims against said estate were presented to said executor aggregating the sum of $169,914.64, and were thereafter allowed and approved by said executor and by the Judge of this court. That within the time so prescribed by said notice to creditors, claims for the purchase price of said cattle, purchased by said deceased just prior to his death, and claims and accounts against said decedent and his estate for labor, provisions and

supplies in the operation of his ranches, and for family, household, and other purposes, were likewise presented to and were paid by, said executor without the affidavit of their correctness prescribed by statute; *but all such claims and accounts, so paid by said executor, were justly due, were paid in good faith,* and the amounts so paid were the true and correct amounts of such indebtedness over and above all payments or setoffs, *and that at the time of the making of such payments the estate of said deceased was solvent.* That all of the said claims and accounts so presented, without affidavits of their correctness, and allowed and so paid, appear and are set forth in said executor's first account, and the payments so made by him were approved by this court by its order duly given and made on the 24th day of May, 1924, settling, allowing, and approving said account after due notice thereof having been given."

In conclusion of law No. 2, Judge Ford said: "\* \* \* the complaint fails to state a cause of action and the evidence is insufficient to authorize the interposition of a court of equity and grant equitable relief upon the facts pleaded by the plaintiff and the evidence adduced in support thereof."

Conclusion of law No. 3 is in part as follows: "\* \* \* plaintiff is estopped and precluded from saying or contending that the said will was not legally admitted to probate and the said defendant, J. H. Gilbert, legally and regularly appointed the executor thereof."

Conclusion of law No. 4 is as follows: "That there was no conversion of any of the funds or property of the estate of said deceased by the said defendant, J. H. Gilbert, as executor of the last will and testament of said deceased, or by any of the other defendants in said cause, and there was not actionable fraud in the administration of said estate by the defendant, J. H. Gilbert, as such executor, or by any of the other defendants therein, and no collusion between said defendant Gilbert and said defendant, The First National Bank of Dillon, Montana, or any of the defendants, to deprive the plaintiff of

any of the property bequeathed to him by the terms of his father's will."

Upon whom do the adjudicated cases place the blame for laches, if laches were shown, under relations such as are shown by the record to have existed between the heirs, the executor and the creditor banks?

On the question of laches the plaintiffs confidently rely upon the old case of *In re Estate of Crosby*, 55 Cal. 574, which was cited in the case of *In re Tuohy's Estate*, 33 Mont. 230, 83 Pac. 486, the opinion of the court by Chief Justice Brantly, as to the status of a claim after its allowance and approval were dealt with in the different phases relative to that question, but that opinion does not follow the California Court's decision relative to laches. Section 1545 of the Code of Civil Procedure of California is substantially similar to our section 10219, Revised Codes. The California section was repealed subsequent to the time judgment in the *Crosby Case* was rendered. But it was repealed several years prior to the commencement of the instant action in the Montana court. I am of the opinion that a judgment grounded upon a repealed statute is not entitled to serious consideration.

For other reasons the *Crosby Case* is not in point here. In that case the deceased left no will and the heirs were the wife and a minor child. The party who was made administrator held the principal claim against the estate in the nature of a judgment obtained against the deceased during his lifetime. A petition for sale of the real estate to pay the claim was not made for seventeen years after the claim was allowed by the probate court. The decision recited the conclusions of Chancellor Kent as to the duty of the executor or administrator of an estate as to diligence in administering such a trust, citing the particular case where Chancellor Kent's wording was found. That commendable treatise by Chancellor Kent has no application to the present case. No will was involved requiring the executor to continue operating the estate property in a manner similar to that of its operation under the

deceased during his lifetime, and no debtor other than the one who petitioned for the sale of the real estate. As I read the opinion, the heirs remained on the premises for seventeen years after the debtor's claim was approved by the probate court before the debtor petitioned for the sale of the real property. No excuse was made for the long delay and obviously none existed. The court there said: "It would be the extreme of hardship, if not of injustice, to allow, at this late day, the heirs and their grantees to be disturbed in the quiet and peaceable possession of the property in question." These words of the court suggest that the heirs continued to live on the property for the seventeen years, that the creditor deferred petitioning for a sale of the real property and that in the meantime other parties became interested in the property as grantees. No such state of facts is before us in the instant case. Here the heirs had abandoned the property when the operation of the ranches became unprofitable, and the *Crosby Case* is not in point for many other reasons.

The record shows, and Judge Ford so found, that continuous efforts were put forth by the executor to sell the property from time to time but without result. It appears quite clear that the creditors and the executor were helpless. Judging it from the amount, the indebtedness had undoubtedly become a tremendous burden on the Dillon bank. The estate was insolvent in 1926, and continued to be insolvent for many years thereafter, and is insolvent now, and owing to the business, industrial, and economic conditions of the country, of which the court will take judicial notice (*Great Northern Ry. Co.* v. *Weeks*, 297 U. S. 135, 56 S. Ct. 426, 80 L. Ed. 532; *Ohio Bell Tel. Co.* v. *Public Util. Comm.*, 301 U. S. 292, 57 S. Ct. 724, 81 L. Ed. 1093; *Taylor* v. *Kuzman Feldspar Co.*, 41 Ariz. 376, 18 Pac. (2d) 649; *In re McCafferty's Estate*, 147 Misc. 179, 264 N. Y. Supp. 38; *Federal Land Bank* v. *Garrison*, 185 S. C. 255, 193 S. E. 308; *Weaver V. Grunbaum*, 31 Cal. App. (2d) 42, 87 Pac. (2d) 406; *Purdie* v. *Roche*, 304 Mass. 647, 24 N. E. (2d) 674; *Dallas etc. Co.* v. *Brooder*, 55 Wyo. 109, 97 Pac. (2d)

311), there was no market and a sale could not have been effected then and thereafter any more than prior to 1926, when every effort was made to find purchasers without avail.

But admitting for the sake of argument only that the creditors were guilty of laches. can the plaintiffs, who come into court seeking equity and having contributed to the causes of insolvency, lay all the blame therefore upon the creditors?

"He who consents to an act is not wronged by it." (Sec. 8744, Rev. Codes.)

"Acquiescence in error takes away the right of objecting to it." (Sec. 8745, Id.)

"No one can take advantage of his own wrong." (Sec. 8746, Id.)

Section 10219, Revised Codes, confers upon both the plaintiff and the defendant the reciprocal and mutual right to apply for and obtain, if the court so approve, an order of sale of the assets of an estate that is being administered and when that right exists the plaintiff is precluded from maintaining an action in equity for an alleged neglect to have property of the estate sold when a remedy was at hand at all times. From the record as a whole and the judicial knowledge of the court of the financial conditions that maintained during that period, one can hardly escape the conclusion that both the creditor banks and the executor and heirs and all parties interested in the estate believed that by holding on there was a possibility of making a fortunate sale and that all might recover what they had lost by the depression in prices.

There was no duty imposed by statute upon either the plaintiffs or defendants to apply for an order of sale, but the right is conferred upon both. Each may act but the statute compels neither. It is settled law that under such circumstances there could be no laches as to one and not as to the other, and if there were laches each would be chargeable therewith. It was said in the case of *City of Parkersburg* v. *Baltimore & O. R. Co.,* 4 Cir., 296 Fed. 74, 83: ''Surely the defendant was guilty

of no delay of which the plaintiff was not equally guilty. If the parties are equally guilty of delay, neither can avail itself of the delay of the other as laches."

In *Marshall* v. *Meyer,* 118 Iowa 508, 92 N. W. 693, 694, it was said: "There is no laches apparent on the part of the defendant which should not apply as well to the plaintiff. There is nothing to indicate that he has been less diligent in asserting his legal rights than has the plaintiff."

The same contention that is made here as to laches in failing to take action when there was no duty or obligation to do so was made in a very recent case of *Dowd* v. *Glenn,* (Cal. App.), 129 Pac. (2d) 964, 968, where it was urged that the respondents in that case were barred by laches for failure to redeem the property involved. In rejecting such contention the court said: "Finally, appellant urges that the trial court erred in not holding that respondents were barred by laches in failing to redeem the property; in other words, that, under the deed of trust they had the right to pay assessments and to be secured therefor, but neglected to exercise it. Whatever right existed, *no duty was imposed upon respondents* to pay the delinquent taxes, and their failure to do so was not a waiver by them of their interest as beneficiary and trustee under the deed of trust. In addition, it may be said that the defense of laches is intended to protect the innocent, *not those who seek to circumvent a statutory provision to the detriment of another.*"

In the case of *In re Tuohy's Estate,* supra, 33 Mont. on page 248, 83 Pac. on page 491, Chief Justice Brantly, speaking for the court where the question of laches was in issue, said: "Under the circumstances we think it would be unjust to the creditors to permit these appellants to assert that the debts finally found to be due from the estate should not be paid."

In the recent South Carolina case of *Charleston Library Society* v. *Citizens & Southern Natl. Bank,* 23 S. E. (2d) 362 at page 364, the court said:

"Now taking up plaintiff's second contention that the defendant hospitals are not in a position to charge laches because

they are *in pari delicto*, we find that from the time the will was probated in 1922 to the year 1934, neither plaintiffs nor defendants did anything. Can either charge the other with delay for that period? Clearly not. There was no more duty to know and to act upon the one side than upon the other. Both are held to the same degree of diligence and in a Court of Equity neither party can charge as laches against the other a failure to know and act according to information which was as much within his range of observation as in that of the other party.

" 'Where both parties were equally at fault, neither can assert laches against the other; and where each of the parties seeks affirmative relief against the other in reference to the same transaction, neither may assert that the other was guilty of laches.' (30 C. J. S., Equity, sec. 114. Also *National City Bank* v. *International Trading Company*, 1932, 167 Wash. 311, 9 Pac. (2d) 81)".

I am unable to find anywhere any decision where the facts have any similarity to those involved in the instant case where the courts have varied from the rule that laches cannot be invoked when the delay is due to litigation by the party alleging laches. (See 30 C. J. S., Equity, sec. 125, p. 548, sec. 127, p. 550; 5 Pomeroy's Equity Jurisprudence (1 Pomeroy's Equitable Remedies), par 35, page 60; *Boyd* v. *Northern Pac. Ry. Co.*, C. C., 170 Fed. 779, affirmed in 9 Cir., 177 Fed. 804, and again affirmed in 228 U. S. 482, 33 S. Ct. 554, 57 L. Ed. 931.)

I can find nothing in the record to justify any contention that the defendants considered the estate closed after the executor's final account was filed, noticed, approved and allowed. In Finding No. 30 by the Honorable William L. Ford in the consolidated cases appealed to this court and determined as shown in *Montgomery* v. *Gilbert*, supra, Judge Ford found that the trustee "does now hold and operate the same [the property of the estate] as such trustee for the benefit of the creditors of his trusteeship, and the legatees and devisees named in said will and testament of said deceased." This should

finally show that there was no intention at any time, as it appears from the record, that the executor or the banks intended to do anything more with the property than to recover the money they had advanced to protect the estate and turn any residue that remained to the heirs.

The judgment of the lower court should be affirmed.